IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

POPCORNED PLANET, INC.,

     Movant,

v.                                                          Case No.: 8:25-mc-28

BLAKE LIVELY,

     Respondent,

_____/

### **POPCORNED PLANET'S AMENDED MOTION TO QUASH SUBPOENA**

Non-party Popcorned Planet, Inc. ("Popcorned Planet"), pursuant to Rule 45(d)(3) of the Federal Rules of Civil Procedure, hereby moves to quash the subpoena served by Respondent Blake Lively ("Respondent") and states as follows:

### Introduction

The Movant herein, Popcorned Planet, Inc., ("Popcorned Planet"), was served with a third-party subpoena issued by Respondent Blake Lively, who is the Plaintiff in a matter pending in the Southern District of New York, styled *Lively v. Wayfarer Studios, LLC, et al*, Case No. 1:24-cv-10049-LJL (consolidated with 1:25-cv-00449-LJL). Popcorned Planet, which is located in Tampa, FL, is a non-party to that action. Pursuant to Federal Rule of Civil Procedure 45(d)(3), Popcorned Planet respectfully requests that this Court quash the subpoena as it seeks disclosure of privileged materials protected under the "reporter's privilege," subjects Popcorned Planet to undue burden in violation of Federal Rule of Civil Procedure 45(d)(3)(A), and exceeds permissible discovery under Federal Rule of Civil Procedure 26.

The subject subpoena (attached hereto as Exhibit "A") commands Popcorned

Planet to produce seven enumerated categories of documents/materials, as follows:

1. All Documents and Communications reflecting or concerning any statements or drafts provided to You by any of the Wayfarer Defendants or their counsel, including in connection with the below-depicted Google Document and other Google Documents or co-working platforms (including without limitation Google Drive, Google Docs, Microsoft OneDrive, Dropbox, Box, iCloud Drive, and Sharepoint).

2. All Documents and Communications concerning any Agreements (draft or final) You have with anyone, including but not limited to counsel for the Wayfarer Parties, that were effective at any point from May 1, 2024 through the present, without regard to the date of drafting or execution, concerning the Consolidated Action, Ms. Lively, Mr. Reynolds, any Wayfarer Defendant, the Digital Campaign, the Marketing Plan, the Film.

3. All agreements (draft or final) you have with anyone, including but not limited to counsel for the Wayfarer Parties, that were effective at any point from May 1, 2024 through the present, without regard to the date of drafting or execution, concerning the Consolidated Action, Ms. Lively, Mr. Reynolds, any Wayfarer Defendant, the Digital Campaign, the Marketing Plan, the Film.

4. All Documents and Communications regarding Your digital, online, Content Creator, or influencer services or strategy concerning the Consolidated Action, Ms. Lively, Mr. Reynolds, any Wayfarer Defendant, the Digital Campaign, the Marketing Plan, the Film, in connection with or on behalf of the Wayfarer Defendants or their counsel. For the avoidance of doubt, this request includes circumstances in which any Wayfarer Defendant or their counsel, or anyone acting on their behalf, provided You with any information that You included or relied on in any of Your content, on whole or in part, including but not limited to as a blind item.

5. All Documents and Communications concerning any statements, talking points, scripts, theories, assertions, questions, advertisements, claims or similar—including preparation, revision, and timing of publication thereof—concerning the Consolidated Action, Ms. Lively, Mr. Reynolds, any Wayfarer Defendant, the Digital Campaign, the Marketing Plan, the Film, that were made in connection with or on behalf of Wayfarer Defendants or their counsel. For the avoidance of doubt, this request includes circumstances in which any Wayfarer

Defendant or their counsel, or anyone acting on their behalf, provided you with a statement, a script, talking points, or any other information You included or relied on in any of Your content, in whole or in part, including but not limited to as a blind item.

6. All Documents and Communications reflecting or concerning any Payment, gift, or favor related to or resulting from any formal or informal Agreement or understanding with any of the Wayfarer Defendants or their counsel, or anyone acting on their behalf, concerning any content You created or shared concerning Ms. Lively, Mr. Reynolds, any Wayfarer Defendant, the Digital Campaign, the Marketing Plan, the Film, or Your public statements or Your views regarding the same.

7. All Documents and Communications between You and any Wayfarer Defendant, their counsel, or anyone on their behalf concerning Ms. Lively, Mr. Reynolds, the Digital Campaign, the Marketing Plan, the Film, or the Consolidated Action.

For the reasons set forth more fully below, each of the above requests is shielded from disclosure pursuant to the reporter's privilege and is otherwise beyond the scope of permissible discovery under Rules 45(d) and 26(b), as the information is readily available from parties to the originating case by way of traditional discovery requests. Accordingly, the subpoena should be quashed by this Court.

## Argument

### I.    The Subpoena Impermissibly Seeks Disclosure of Privileged Materials

Federal Rule of Civil Procedure 45(d)(1) provides that "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Further, "[t]he court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply." *Id.*

3

Rule 45(d)(3) sets forth the circumstances under which a court is required to quash a subpoena, stating as follows in relevant part:

**(3) Quashing or Modifying a Subpoena.**

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

…

**(iii)** ***requires disclosure of privileged or other protected matter***, if no exception or waiver applies; or

**(iv)** subjects a person to ***undue burden***.

Fed. R. Civ. P. 45(d)(3) (emphasis added).

As outlined below, the subpoena served upon Popcorned Planet impermissibly seeks materials that are protected from disclosure under three independent categories of "reporter's privilege" explicitly recognized by Florida courts.

## A. The Florida Reporter's Privilege

The "reporter's privilege," as it has come to be known throughout this nation, traces its origins to the colonial period prior to the drafting of the Constitution. In 1722, James Franklin, a journalist for the New England Courant, was arrested and imprisoned for refusing to disclose the source of a controversial story that was printed in his newspaper.[1] During his imprisonment, control of the newspaper fell to James's younger brother, Benjamin Franklin, who was only 16 years old at the time. *Id.* Benjamin, who would later play a crucial role in the formation of the Constitution, and in particular the drafting of the First Amendment guarantees of free speech and a free press, authored a number of articles criticizing his brother's imprisonment as

---

[1] Ervin, *In Pursuit of A Press Privilege*, 1974, 11 Harv.J.Legis. 233.

4

a tyrannical attack on press freedom, and boldly championing free speech and a free press as "essential to free Governments."[2] The experience of witnessing his brother's imprisonment for refusing to disclose a source inspired the young Benjamin Franklin to publish these immortal words: "Whoever would overthrow the Liberty of a Nation, must begin by subduing the Freeness of Speech." *Id*. This event undoubtedly served as the impetus for the specific inclusion of freedom of speech, and of the press, among the very first rights guaranteed by our Constitution's Bill of Rights. Now, more than two centuries later, the protection of confidential sources is recognized as fundamental to Florida's public policy, and extends protections to the press under three distinct legal doctrines: 1) Florida common law, 2) Florida's statutory shield law, and 3) the First Amendment as applied by the Eleventh Circuit and Florida courts.

    i) <u>The Common Law Privilege</u>: The Florida Supreme Court first established a qualified reporter's privilege deriving from the First Amendment over four decades ago in *Morgan v. State*, 337 So. 2d 951 (Fla. 1976). The Florida Supreme Court subsequently acknowledged the existence of a qualified reporter's privilege under Florida common law as well. *See State v. Davis*, 720 So. 2d 220, 227 (Fla. 1998) ("we hold that a qualified reporter's privilege exists in Florida and that such a privilege extends to both confidential *and* nonconfidential information gathered in the course

---

[2] "Silence Dogood, No. 8, 9 July 1722," *Founders Online,* National Archives, available at https://founders.archives.gov/documents/Franklin/01-01-02-0015.    [Original    source: *The Papers of Benjamin Franklin*, vol. 1, *January 6, 1706 through December 31, 1734*, ed. Leonard W. Labaree, New Haven: Yale University Press, 1959, pp. 27–30.] (last accessed July 25, 2025).

of a reporter's employment") (emphasis in original);[3] *Tribune Co. v. Huffstetler*, 489 So. 2d 722, 723-24 (Fla. 1986). "[O]nce the privilege attaches, a court must apply the three-prong balancing test used by an overwhelming majority of other states to determine whether the privilege will act to prevent the disclosure of the reporter's information." *Davis*, 720 So.2d at 227. Thus, where the privilege has been invoked, disclosure of the requested information is precluded unless the requesting party is able to establish that: "(1) the reporter possesses relevant information; (2) the same information is not available from alternative sources; and (3) the movant has a compelling need for any information the reporter may have." *Id.* at 227.

ii) <u>The Florida Shield Law</u>: Florida's statutory "Journalist's Privilege," enacted in 1998,[4] provides as follows, in relevant part:

**(1) Definitions**.--For purposes of this section, the term:

(a) "News" means information of public concern relating to local, statewide, national, or worldwide issues or events.

(b) "Professional journalist" means a person regularly engaged in collecting, photographing, recording, writing, editing, reporting, or publishing news, for gain or livelihood, who obtained the information sought while working as a salaried employee of, or independent contractor for, a newspaper, news journal, news agency, press association, wire service, radio or television station, network, or news magazine. Book authors and others who are not professional journalists, as defined in this paragraph, are not included in the provisions of this section.

**(2) Privilege.**-- A professional journalist has a qualified privilege not to be a witness concerning, and ***not to disclose the information,***

---

[3] The *Davis* Court also recognized the common law qualified reporter's privilege as a distinct legal doctrine existing independent of the legislatively created "Journalist's Privilege" under Fla. Stat. § 90.5015, while noting that its holding was nevertheless "consistent with" the statutory privilege. *Davis*, 720 So. 2d at 227-28.

[4] Chapter 98-48, Laws of Florida; Codified as Section 90.5015, Florida Statutes.

***including the identity of any source***, that the professional journalist has obtained while actively gathering news. This privilege applies only to information or eyewitness observations obtained within the normal scope of employment and does not apply to physical evidence, eyewitness observations, or visual or audio recording of crimes. ***A party seeking to overcome this privilege must make a clear and specific showing that***:

(a) The information is relevant and material to unresolved issues that have been raised in the proceeding for which the information is sought;

(b) The information cannot be obtained from alternative sources; and

(c) A compelling interest exists for requiring disclosure of the information.

**(3) Disclosure.–** A court shall order disclosure pursuant to subsection (2) only of that portion of the information for which the showing under subsection (2) has been made and shall support such order with ***clear and specific findings made after a hearing***.

**(4) Waiver.–** A professional journalist does not waive the privilege by publishing or broadcasting information.

**(5) Construction.–** This section must not be construed to limit any privilege or right provided to a professional journalist under law.

Fla. Stat. § 90.5015 (emphasis added).

In sum, the statute defines a "professional journalist" as someone regularly engaged in news-related activities for compensation and defines "news" as information of public interest concerning issues or events of various scopes. Fla. Stat. § 90.5015(1). The statute provides journalists with a qualified privilege against being compelled to disclose information, including confidential sources, gathered during the normal course of their news gathering activities. A party seeking to overcome the statutory privilege must satisfy the three enumerated requirements under subsection (2), which are nearly identical to the requirements of the common law privilege's three-prong test. Fla. Stat. § 90.5015(2)(a)-(c). The statutory privilege imposes a

7

heavy evidentiary burden on the party seeking disclosure, requiring that each prong be established by a "*clear and specific showing*" to overcome privilege, and requiring courts to support any order compelling disclosure with "*clear and specific findings*" following a hearing. Fla. Stat. § 90.5015(2)-(3).

iii) <u>The First Amendment Privilege</u>: The Eleventh Circuit also acknowledges a First Amendment-based privilege protecting reporters' confidential sources. To overcome this privilege, the requesting party must provide "substantial evidence[:]: that the challenged statement was published and is both factually untrue and defamatory; [2] that reasonable efforts to discover the information from alternative sources have been made and that no other reasonable source is available; and [3] that knowledge of the identity of the informant is necessary to proper preparation and presentation of the case." *Miller v. Transamerican Press, Inc.*, 628 F.2d 932 (5th Cir. 1980) (per curiam) ("*Miller II*");[5] *accord Price v. Time, Inc.*, 416 F.3d 1327 (11th Cir. 2005); *United States v. Caporale*, 806 F.2d 1487, 1504 (11th Cir. 1986).

**B. Popcorned Planet is Entitled to Invoke the Reporter's Privilege**

Popcorned Planet is unquestionably entitled to invoke Florida's statutory Shield Law, as well as the common-law and constitutional privileges recognized by both state and federal courts in Florida. To begin with, Florida courts have already determined that the statutory Journalist's Privilege under § 90.5015 applies to internet-based entities, as long as they report news. *See Gubarev v. BuzzFeed, Inc.*,

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions issued by the 5th Circuit before September 30, 1981, the date on which the former Fifth Circuit was divided into the Fifth and Eleventh Circuits.

365 F. Supp. 3d 1250 (S.D. Fla. 2019); *TheStreet.com v. Carroll*, 20 So. 3d 947 (Fla. 4th DCA 2009); *Carroll v. TheStreet.com, Inc.*, 2014 WL 5474048, at *6 (S.D. Fla. Apr. 10, 2014). The content published by Popcorned Planet clearly satisfies the statutory definition of "news," as it constitutes "information of public concern relating to local, statewide, national, or worldwide issues or events"—namely, in the categories of entertainment, culture and current events. Fla. Stat. § 90.5015(1)(b).

Additionally, Mr. Signore, who is the CEO of Popcorned Planet, clearly qualifies as a "professional journalist" under the statutory criteria. To wit, (1) he is, and was at all material times, regularly engaged in collecting, reporting, and publishing news, for gain or livelihood, and (2) he obtained the information sought while working as a paid employee of Popcorned Planet. Additionally, Mr. Signore is a person of considerable notoriety in the entertainment and media industries, with extensive experience and accomplishments in these industries. An early pioneer in the online space, Mr. Signore worked as a head of digital programming for high level talent agencies such as The Collective, Beverly Hills, and media companies such as Disney.com,[6] Break Media and Defy Media, to bridge talent and traditional programming onto the internet.[7] As the Senior VP of programming at Defy Media, he created, wrote for and hosted numerous entertainment news channels, including

---

[6] Mr. Signore was employed by Disney's Internet Media Group as lead producer of the Original Content Development team for Disney.com.

[7] *See* Andy Signore Biography, IMDb, available at https://www.imdb.com/name/nm0797520/bio/?ref_=nm_ov_bio_sm (last accessed July 25, 2025).

"ScreenJunkies" (6.8 million subscribers) and "ClevverTV" (2.3 million subscribers).[8] His biting critical entertainment analysis garnered him numerous accolades, including awards from MTV, Variety. along with Streamy and Webby awards*, and two* Primetime Emmy nominations.[9]

He has appeared as a news commentator on various television news networks including CNN and FOX News, as well as a reoccurring guest on various programs such as Piers Morgan Uncensored, and Netflix Documentaries. He has also hosted massive celebrity driven panels across the country including world famous San Diego comic con that have garnered headlines.[10] Mr. Signore's independent news coverage for Popcorned Planet truly exploded during the Johnny Depp v. Amber Heard trial, garnering millions of daily views and international recognition. Mr. Signore's news coverage for Popcorned Planet has continued to steadily gain notoriety and recognition all the way through the Sean "Diddy" Combs trial, and now the Blake Lively v. Justin Baldoni trial. To date, the Popcorned Planet's entertainment news videos published on its YouTube channel have received more than 360 million total views.

---

[8] *See* Andy Signore | Honest Trailers Wikia | Fandom, available at https://honest-trailers.fandom.com/wiki/Andy_Signore#Other_work (last accessed July 25, 2025).

[9] *See* note 7, supra, Andy Signore Biography, IMDb.

[10] *See Ambler-native 'Screen Junkie' hosts 'Captain America' panel*, The Mercury (Sept. 24, 2021), available at https://www.pottsmerc.com/2016/06/06/ambler-native-screen-junkie-hosts-captain-america-panel/ (last accessed July 25, 2025); *Chris Evans Explains How Captain America: Civil War Came To Be*, Comicbook.com (Sept. 6, 2017), available at https://comicbook.com/marvel/news/chris-evans-explains-how-captain-america-civil-war-came-to-be/ (last accessed July 25, 2025).

Popcorned Planet, as a corporate entity that produces and publishes news stories to the public through its website[11] and its dedicated YouTube channel,[12] qualifies as a "news agency," "news journal," or "news magazine" as those terms have been interpreted by Florida courts. With nearly one-million subscribers, Popcorned Planet has become one of the most popular entertainment news outlets on the internet, and is among elite company in approaching the one-million-subscriber benchmark, rivaling (and in some cases surpassing) industry stalwarts such as TMZ,[13] E! News,[14] Entertainment Weekly,[15] Us Weekly,[16] The Hollywood Reporter,[17] Perez Hilton,[18] and Rolling Stone.[19]

The fact that Popcorned Planet publishes its news content exclusively online in no way disqualifies it or its employed journalists from protection under the

---

[11] *See* Popcorned Planet Website, available at https://popcorned-shop.fourthwall.com/ (last accessed July 25, 2025).

[12] *See* Popcorned Planet YouTube Channel, at https://www.youtube.com/c/PopcornedPlanet/videos (last accessed July 25, 2025).

[13] TMZ's YouTube channel has 4.89 million subscribers. *See* TMZ YouTube Channel, at https://www.youtube.com/TMZ/videos (last accessed July 25, 2025).

[14] E! News' YouTube channel has 2.39 million subscribers. *See* E! News YouTube Channel, at https://www.youtube.com/@enews (last accessed July 25, 2025).

[15] Entertainment Weekly's YouTube channel has 739,000 subscribers. *See* Entertainment Weekly YouTube Channel, at https://www.youtube.com/c/entertainmentweekly/videos (last accessed July 25, 2025).

[16] Us Weekly's YouTube channel has 445,000 subscribers. *See* Us Weekly YouTube Channel, at https://www.youtube.com/c/UsWeekly/videos (last accessed July 25, 2025).

[17] The Hollywood Reporter's YouTube channel has 1.28 million subscribers. *See* The Hollywood Reporter YouTube Channel, at https://www.youtube.com/hollywoodreporter (last accessed July 25, 2025).

[18] Perez Hilton's YouTube channel has 555,000 subscribers. *See* Perez Hilton YouTube Channel, at https://www.youtube.com/@PerezHilton/videos (last accessed July 25, 2025).

[19] Rolling Stone's YouTube channel has 1 million subscribers. *See* Rolling Stone YouTube Channel, at https://www.youtube.com/c/rollingstone (last accessed July 25, 2025).

privilege statute. The statutory language broadly defines the range of media outlets entitled to protection, as opposed to limiting the privilege to traditional print, television, or radio news organizations, or so-called "mainstream news" agencies. Indeed, the courts in *Gubarev v. BuzzFeed,* supra, 365 F. Supp. 3d 1250, and *TheStreet.com v. Carroll*, supra, 20 So. 3d 947, expressly rejected any such "traditional media" standard in finding that media outlets that publish news content to the public exclusively on the internet, including on the company's website and on Facebook, and reporters working for those outlets, fall within the scope of the statutory Journalist's Privilege under Fla. Stat. § 90.5015. Moreover, any argument to the contrary would be entirely unreasonable given the internet-dominated culture of 21st century America, where the popularity of online media has grown rapidly in contrast to a precipitous decline in the consumption of traditional print and television media.[20]

---

[20] *See Newspapers Face a Challenging Calculus*, Pew Res. Ctr. (Feb. 26, 2009), available at http://pewresearch.org/pubs/1133/decline-print-newspapers-increased-online-news ("The trend is unmistakable: Fewer Americans are reading print newspapers as more turn to the internet for their news. And while the percentage of people who read newspapers online is growing rapidly, especially among younger generations, that growth has not offset the decline in print readership") (last accessed July 25, 2025); *see also Web Surpasses TV, Papers as Top News Source*, Washington Times (Feb. 28, 2008), available at http://www.washingtontimes.com/news/2008/feb/28/web-surpasses-tv-papers-as-top-news-source/?page=all ("News hungry Americans are yielding to the siren call of cyberspace: Almost half of us say that the Internet is now our primary source of news and information, trumping television, radio and newspapers, according to a Zogby Interactive poll released yesterday. The survey found that 48 percent went online for enlightenment. About 29 percent looked to television and 11 percent went to radio[,]" with newspapers ranking last at only 10 percent) (last accessed July 25, 2025); John Nichols & Robert W. McChesney, *The Death and Life of Great American Newspapers*, Nation (Mar. 18, 2009), available at https://www.thenation.com/article/archive/death-and-life-great-american-newspapers/ ("[N]ewspapers, as we have known them, are disintegrating and are possibly on the verge of extinction") (last accessed July 25, 2025).

Extending the reporter's privilege to independent online media outlets like Popcorned Planet, and not just to traditional mainstream media organizations, is also on all fours with the Constitutional origins of the privilege under the First Amendment, as recognized by the Supreme Court in *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). Writing for the majority, Justice Byron White recognized that defining the privilege narrowly would be "a questionable procedure in light of the traditional doctrine that liberty of the press is the right of the lonely pamphleteer . . . just as much as of the large metropolitan publisher." *Id.* at 704. "Freedom of the press," Justice White continued, "is a 'fundamental personal right' which 'is not confined to newspapers and periodicals.'" *Id.* (quoting *Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938)). Broadly speaking, "[t]he press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Id.* (citation omitted). Notably, both the Florida common law reporter's privilege and the First Amendment privilege recognized by the Eleventh Circuit trace their origins to the Supreme Court's plurality in *Branzburg*. *See Davis*, 720 So. 2d at 223 ("The qualified reporter's privilege in Florida finds its origins in the United States Supreme Court plurality opinion in *Branzburg*"); *Price*, 416 F.3d at 1343 (citing *Branzburg* as the genesis for Eleventh Circuit precedent recognizing that "a reporter has a First Amendment privilege which protects the refusal to disclose the identity of confidential informants").

### C. Respondent Lively Cannot Satisfy the Standard Required to Overcome the Reporter's Privilege

While Popcorned Planet is under no *burden* to prove a negative—i.e., prove that Respondent Lively cannot meet *her* burden—this memorandum will nevertheless demonstrate that Respondent Lively cannot do so. Specifically, even assuming, *arguendo*, that Respondent Lively could establish the first element of the three part test under each of the three privilege doctrines discussed above (i.e., that the information is relevant and material to unresolved issues in the proceeding), it is undeniable that she cannot overcome the other two elements—i.e., that the information is not available from other sources, and that there is a compelling need for disclosure.

i) <u>The Requested Information Can be Obtained from Other Sources and There is No Compelling Need for Disclosure:</u> To satisfy the second element of the three-part test under either the statutory Journalist's Privilege, the common law reporter's privilege, or the First Amendment privilege, the party requesting disclosure must show that the "information cannot be obtained from alternative sources." Fla. Stat. 90.5015(2). *See also Davis*, 720 So.2d at 224 (second prong of common law privilege test requires showing "the same information is not available from alternative sources"); *Price*, 416 F.3d at 1342 (second prong of First Amendment privilege test requires showing that "reasonable efforts to discover the information from alternative sources have been made and that no other reasonable source is available"); *Redd v. U.S. Sugar Corp.*, No. CL 91-13380 AB, 1993 WL 428667, at *2 (Fla. Cir. Ct. 1993) (quashing subpoena to newspaper, finding, in relevant part, the requesting party

"failed to meet the legal tests [for overcoming the First Amendment reporter's privilege] in that it has failed to exhaust or make reasonable attempts to exhaust non-media sources for the information sought[.]"); *Gadsden Cnty. Times, Inc. v. Horne*, 426 So. 2d 1234, 1242 (Fla. 1st DCA 1983) (reversing court order as "clearly erroneous" where it incorrectly held that requesting party was not required to "pursue other avenues in attempting to identify the Times' confidential sources").

This second element of the test has been strictly interpreted by Florida courts. In fact, courts have required the requesting party to explore more than 100 possible alternative sources before compelling disclosure of confidential source information. *See Overstreet v. Neighbor*, 9 Media L. Rep. 2255, 2256 (Fla. Cir. Ct. 1983) (requiring requesting party to exhaust 117 potential alternative sources to defeat common law privilege); *Price*, 416 F.3d at 1346 ("Price has taken some depositions, but not enough" to satisfy the second element of the First Amendment privilege test). The test is not whether it would burden the requesting party to pursue other alternative sources for the information; rather, "[t]he test is simply whether other sources for the same information are available." *Florida v. Abreau*, 16 Med. L. Rep. 2493, 2494 (Fla. Cir. Ct. 1989). Furthermore, Eleventh Circuit precedent holds that actual sworn depositions are necessary to satisfy this second prong of the test; merely interviewing potential sources or other informal methods of seeking the information is not sufficient. *Price*, 416 F.3d at 1347.

In the present dispute, the subject subpoena itself leaves no doubt that the requested information is indeed available from other sources—specifically, the party

defendants themselves. As can be seen, each of the seven categories of information requested by the subpoena seeks information expressly described as being within the possession or *control* of the party defendants. *See* Exhibit "A," Req. No. 1 (requesting any information provided "by any of the Wayfarer Defendants or their counsel"), Req. No. 2 (requesting any agreements with "counsel for the Wayfarer Parties"), Req. No. 3 (requesting any agreements with "counsel for the Wayfarer Parties"); Req. No. 4 (requesting information provided by "the Wayfarer Defendants or their counsel, or anyone acting on their behalf"); Req. No. 5 (requesting information provided by "the Wayfarer Defendants or their counsel, or anyone acting on their behalf"); Req. No. 6 (requesting information about any payments or gifts received from "the Wayfarer Defendants or their counsel, or anyone on their behalf"); Req. No. 7 (requesting communications with "the Wayfarer Defendants, their counsel, or anyone on their behalf").

No plausible argument can be made that alternative sources for the requested information do not exist. Any information originating from the "Wayfarer Defendants" themselves would obviously be available from those party defendants. Furthermore, because the Wayfarer Defendants' counsel and "anyone acting on [] behalf [of the Wayfarer Defendants or their counsel]" are by definition the *agents* of the Wayfarer Defendants, any information originating from those sources is likewise within the Wayfarer Defendants' *control* for purposes of the Federal discovery rules.

Furthermore, the fact that Respondent Lively has apparently declined to seek the requested information from the party defendants negates a finding that there is

16

a compelling need for the information—the third prong of the test. If the requested information was so critical to Respondent Lively's case, it is only reasonable to expect that she would have focused her time, attention and court resources on obtaining it from the party defendants, rather than waiting until the tail end of the discovery period to burden a non-party news entity with what can fairly be described as a textbook fishing expedition.

In sum, as an online news outlet of considerable notoriety in the entertainment and culture infosphere, Popcorned Planet qualifies for protection under the statutory Journalist's Privilege, as well as the common law reporter's privilege and the First Amendment reporter's privilege. The information and materials requested in the subpoena fall squarely within the reporter's privilege, and Respondent is simply unable to meet her burden of satisfying the three-part test for overcoming the privilege under *any* of the three legal doctrines discussed above.

Accordingly, pursuant to Rule 45(d)(3)(A)(iii), because each of the non-party production requests set forth in the subject subpoena seek information that is shrouded from disclosure by the reporter's privilege, and because Respondent Lively cannot satisfy the three-part test necessary to overcome the privilege, the subpoena impermissibly exceeds the scope of discovery under Rules 45 and 26, and must be quashed by this Court.

## II. The Subpoena Imposes an Undue Burden on Popcorned Planet

As noted above, Federal Rule of Civil Procedure 45(d)(3)(A)(iv) provides that a subpoena must be quashed if it imposes an undue burden. Popcorned Planet, a non-party, should not be subjected to extensive document production, especially when

17

Respondent has not exhausted more direct avenues to obtain the requested information from the defendants themselves. Courts have recognized that non-party subpoenas under Rule 45 remain subject to the constraints on the scope of discovery as set forth under Rule 26. *See Maxwell v. Health Ctr. of Lake City, Inc.*, 2006 WL 1627020, at *3 (M.D. Fla. 2006). To that end, Rule 26(b) provides that a court is *required*, "[o]n motion or on its own, [to] limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that," in relevant part:

> **(i)** the discovery sought is unreasonably cumulative or ***duplicative***, or ***can be obtained from some other source*** that is more convenient, less burdensome, or less expensive;
>
> **(ii)** the party seeking discovery has had ***ample opportunity*** to obtain the information ***by discovery in the action***; or

Fed. R. Civ. P. 26(b)(2)(C) (emphasis added).

In applying this rule in the context of Rule 45 subpoenas to non-parties, courts within the Eleventh Circuit have held that where the information requested is available from another party to the action by way of traditional discovery requests, a party must obtain the information from the other party rather than imposing a burden on a non-party by issuing a Rule 45 subpoena. *See Richardson v. Bradley*, No. 3:17-cv-921, 2018 WL 11706748, at *1 (N.D. Fla. 2018) ("although Plaintiff may be entitled to the issuance of a subpoena commanding the production of documents from non-parties … the court will consider granting such a request ***only if the documents sought from the non-party are not equally available to Plaintiff and are not obtainable from Defendant*** through a request for production of documents under

Rule 34") (emphasis added); *Maxwell*, 2006 WL 1627020, at *4 ("in an effort to spare third parties the expense and cost of responding to the subpoenas, the Court finds that Defendant ought to first attempt to obtain such evidence directly from Plaintiff pursuant to other available avenues under the Federal Rules of Civil Procedure. Importantly, Defendant has not stated that it has tried to obtain such information directly from Plaintiff through other means" and "caution[ing] Defendant to avoid discovery requests that amount to mere fishing expeditions"); *Largent v. Thermocarbon, Inc.*, No. 6:11-cv-335, 2011 WL 13323151, at *4 (M.D. Fla. 2011) (same); *Cute v. ICC Cap. Mgmt., Inc.*, No. 6:09-cv-1761, 2010 WL 11626590, at *5 (M.D. Fla. 2010) (same); *Serrala US Corp. v. Paschke*, No. 3:21-cv-907, 2022 WL 19333286, at *2 (N.D. Fla. 2022) (collecting cases, and holding "[i]t appears that Plaintiff should be able to obtain the information it requested in the third-party subpoenas from Defendants themselves. Thus, the Court does not believe it is appropriate to allow Plaintiff to seek this information from Defendants' customers via third-party subpoenas at this time") (citing *Rossman v. EN Eng'g, LLC*, 467 F. Supp. 3d 586, 590 (N.D. Ill. 2020) ("A non-party subpoena seeking information that is readily available from a party through discovery may be quashed as duplicative or cumulative."); *HDSherer LLC v. Natural Molecular Testing Corp.*, 292 F.R.D. 305, 309 (D.S.C. 2013) (quashing third-party subpoenas to Defendant's customers because "all of the information sought by Plaintiffs directly concerns Defendant and would be in Defendant's possession")).

As may be seen, each of the seven production requests in the subject subpoena seeks information concerning communications between Popcorned Planet and the defendants to the originating action or agents acting on their behalf. Therefore, the information Respondent seeks from Popcorned Planet is available directly from the party defendants, rendering this subpoena cumulative, duplicative and otherwise beyond the scope of the limitations on discovery set forth under Rule 26(b)(2)(C).

The Respondent, as the party seeking discovery from a non-party via Rule 45 subpoena, bears the burden of demonstrating that she has exhausted less burdensome means of obtaining the information. As Responded is unable to demonstrate as such, the subpoena should be quashed in its entirety.

## III.    Conclusion

For the reasons set forth herein, and pursuant to the above cited authority, non-party Popcorned Planet respectfully requests this Court grant this motion, quash the subpoena, and award Popcorned Planet its reasonable attorney's fees incurred in preparing and filing this motion, as provided by Rule 45(d)(1).

Respectfully submitted this 29th day of July, 2025,

/s/ David P. Mitchell
**Jeffrey "Jack" Gordon, Esquire**
Florida Bar No.: 836760
**David P. Mitchell, Esquire**
Florida Bar No.: 67249
**MANEY | GORDON TRIAL LAWYERS**
101 East Kennedy Boulevard, Suite 1700
Tampa, Florida 33602
T: (813) 221-1366   F: (813) 223-5920
j.gordon@maneygordon.com
d.mitchell@maneygordon.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished via electronic mail on this 29th day of July, 2025, to the following:

Esra A. Hudson
ehudson@manatt.com
Stephanie Roeser
sroeser@manatt.com
Sarah Moses
smoses@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Counsel for Respondent, Blake Lively

*/s/ David P. Mitchell*_____
**David P. Mithell, Esquire**