IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

POPCORNED PLANET, INC.,

     Movant,

v.                                           Case No.: 8:25-mc-28

BLAKE LIVELY,

     Respondent,

_____/

## POPCORNED PLANET'S RESPONSE IN
## OPPOSITION TO BLAKE LIVELY'S CROSS MOTION TO COMPEL

Popcorned Planet, by and through its undersigned counsel, hereby submits its Response in Opposition to Blake Lively's Cross Motion to Compel (ECF No. 8), and in support thereof, states as follows:

### Introduction

Ms. Lively's Cross-Motion to Compel (ECF No. 8) rests on two flawed premises: (1) that Andy Signore and Popcorned Planet are not engaged in protected journalism, and (2) that the subpoena seeks only "non-privileged" material necessary to the underlying case. Both are incorrect.

First, Florida law, the First Amendment, and binding Eleventh Circuit precedent recognize a broad journalist's privilege protecting both confidential and non-confidential information gathered in the course of reporting. Popcorned Planet clearly qualifies as a protected news outlet. Andy Signore's work—ranging from daily reporting, exclusive scoops, investigative coverage of litigation, and interviews with whistleblowers—is paradigmatic journalism. The out-of-context 2020 Tweet Ms.

Lively relies upon has been conclusively rebutted by sworn testimony from the CEO of FandomWire—an entertainment news outlet—which employed Mr. Signore as a paid journalist at the time of the subject Tweet. *See* Declaration of Reilly Johnson ("Johnson Declaration"), ¶ 2-5; Declaration of Andy Signore ("Signore Declaration"), ¶ 14.

Second, Ms. Lively has not made the required "clear and specific showing" that (1) the information sought cannot be obtained elsewhere, and (2) a compelling need exists. Instead, the record shows that the sought-after information can and should be obtained from parties to the underlying litigation—the Wayfarer defendants. Accordingly, the Cross-Motion to Compel should be denied.

## I. Ms. Lively Misstates the Law and Facts Regarding Journalistic Privilege

Florida law recognizes three distinct reporter's privileges: (1) common-law privilege, (2) statutory privilege under Fla. Stat. § 90.5015, and (3) First Amendment-based privilege as recognized by the Eleventh Circuit.

### A. Popcorned Planet is Entitled to Protection Under the Florida Statutory Privilege

Ms. Lively's motion focuses entirely upon the Florida statutory privilege, arguing that Popcorned Planet and Mr. Signore do not satisfy the applicable definitions that frame the scope of the privilege. Specifically, Ms. Lively erroneously suggests that Popcorned Planet and Mr. Signore are essentially one and the same, and are thus ineligible for protection under the Florida statutory privilege. Ms. Lively is incorrect. As the record reflects, Popcorned Planet has been maintained as a 501(c)(3) corporation since its inception in June of 2022. *See* Signore Declaration, ¶

2

3. Popcorned Planet operates as an independently funded, publicly accessible news and commentary channel with nearly 1 million subscribers and a large daily viewership, hosted on Popcorned Planet's designated YouTube channel. *Id.* at ¶ 4. Popcorned Planet operates entirely through viewer support, advertising revenue, and merchandise sales. *Id.* at ¶ 7.

Mr. Signore is the founder and CEO of Popcorned Planet, and is employed as the show's main host and investigative reporter. *Id.* at ¶ 2, 5. Mr. Signore receives a salary from Popcorned Planet, and is not the only paid employee of Popcorned Planet. *Id.* at ¶ 5, 6.

The Florida "Journalist's Privilege" statute defines a "professional journalist" as "a person regularly engaged in collecting, photographing, recording, writing, editing, reporting, or publishing news, for gain or livelihood, who obtained the information sought while working as a salaried employee of, or independent contractor for, a newspaper, news journal, news agency, press association, wire service, radio or television station, network, or news magazine." Fla. Stat. § 90.5015(1)(a).

Popcorned Planet and Mr. Signore meet this definition. Florida courts have held that internet-based news media outlets, similar to Popcorned Planet, qualify as a "news agency," "news journal," or "news magazine." *Gubarev v. BuzzFeed, Inc.*, 365 F. Supp. 3d 1250 (S.D. Fla. 2019); *TheStreet.com v. Carroll*, 20 So. 3d 947 (Fla. 4th DCA 2009); *Carroll v. TheStreet.com, Inc.*, 2014 WL 5474048, at *6 (S.D. Fla. Apr. 10, 2014). Popcorned Planet is no different than the internet-based outlets at issue in the

aforementioned cases for purposes of the statutory definition, as it operates as a for-profit corporation, supported by advertising, merchandise and subscriptions, with a large subscriber base, reporting "information of public concern relating to local, statewide, national, or worldwide issues or events." Fla. Stat. § 90.5015(1)(b) (defining "news").

Mr. Signore is a salaried employee of Popcorned Planet, and its CEO, where he regularly engages in performing investigative journalism and disseminating news to the public as the show's host, building upon his extensive career in journalism and entertainment news reporting. Signore Declaration, ¶ 2, 5, 8. As such Mr. Signore qualifies as a "paid journalist" as defined by the Florida statutory privilege.

B. The 2020 Tweet Highlighted by Ms. Lively Is Inaccurate and Out of Context

In support of her argument, Ms. Lively seizes on Mr. Signore's statement in a 2020 Tweet that he was "not a paid journalist." That Tweet is presented entirely out of context by Ms. Lively and does not accurately represent the status of Mr. Signore's employment at the time. First, as Reilly Johnson, the CEO of FandomWire since 2017, confirms under penalty of perjury, Mr. Signore was indeed being compensated as a paid reporter for FandomWire at the time of the Tweet, securing entertainment news scoops for the news outlet. *See* Johnson Declaration, ¶¶ 2-5; Signore Declaration, ¶ 14. Second, as the full Tweet thread demonstrates, Mr. Signore was merely attempting to make a distinction between a journalist and a reporter, based on his understanding of those terms at that time, and, importantly, includes a statement by Mr. Signore that he reports news and protects sources. *See* Signore

Declaration, ¶ 14. Thus, the Tweet was not a denial by Mr. Signore of his profession, but rather a mischaracterized comment stripped of context.

Beyond that, Mr. Signore's long record of journalistic work—covering trials involving entertainment industry heavyweights (e.g., *Depp v. Heard*, *USA v. Combs*, among others), producing investigative documentaries, cultivating confidential sources, and conducting exclusive interviews—falls squarely within the definition of news gathering and reporting. *See* Signore Declaration, ¶¶ 8-13. Ms. Lively's reliance on outdated materials such as an IMDb bio from 2013 and an old LinkedIn profile is both misleading and irrelevant to his present journalistic role. As Mr. Signore explains in his Declaration, the IMDb biography relied upon by Ms. Lively predates Mr. Signore's work with ScreenJunkies and Popcorned Planet, and is publicly editable, and irrelevant to his current role. *Id*. at ¶ 15. Additionally, the LinkedIn profiled relied upon by Ms. Lively is severely outdated, having been last updated in 2018, and as such, merely reflects a transitional period before Popcorned Planet had become a mature journalistic brand. *Id*. at 16.

Ms. Lively's misleading summary of the various social media profiles[1] of Popcorned Planet and Mr. Signore fails to acknowledge that Popcorned Planet's YouTube home page defines its content as "*Daily News*, Entertainment, Pop Culture Controversies, Missing Persons and True Crime Cases,"[2] and that Mr. Signore's

---

[1] To provide an illustration of the irrelevance of using social media profiles as evidence of one's profession, it should be noted that Ms. Lively's X profile states "I found my Twitter password" and links to her drink business. *See* https://x.com/blakelively (accessed August 25, 2025). Thus, by Ms. Lively's own logic, she is not an actress. This, of course, is clearly not the case, just as Mr. Signore's social media profile is not dispositive evidence of his profession.
[2] *See* McCawley Declaration, Exhibit F (ECF No. 9-6) (emphasis added).

X/Twitter profile describe him as "CEO & Host" of Popcorned Planet, emphasizing "*Daily News*."[3] Indeed, Ms. Lively's own motion highlights Mr. Signore's bona fides as an investigative reporter, noting that Mr. Signore has scooped even the institutionalized press, noting that Mr. Signore reported certain content "hours before it was publicly reported elsewhere." *See* ECF No. 8, pg. 10.

As quoted above, Florida's journalist's privilege statute defines a "professional journalist" as one "regularly engaged in collecting, ... reporting, or publishing news, for gain or livelihood." Fla. Stat. § 90.5015(1)(a). Mr. Signore's extensive career achievements in the entertainment news industry, and his current salaried employment as an investigative reporter and program host for Popcorned Planet, clearly satisfies this definition.

C. <u>Ms. Lively's "Content Creator" Argument is a Red Herring, as The First Amendment Privilege Determines Journalistic Status Functionally, Not by Labels</u>

Ms. Lively relies on TAG's interrogatory responses labeling Mr. Signore as a "content creator" rather than a "reporter." This terminology is irrelevant. To begin with, the term "content creator" is so broad that it would encompass virtually any journalist publishing in digital formats. Courts have consistently rejected attempts to deny privilege based on semantics rather than substance. The First Amendment reporter's privilege, which exists independent of the Florida statutory privilege, determines the scope of the privilege using a functional analysis, rather than categorical labels. Fifty years ago, this Court in *Loadholtz v. Fields* made the

---

[3] *See* McCawley Declaration, Exhibit G (ECF No. 9-7) (emphasis added).

following observations regarding the First Amendment implications of compelling

disclosure of a reporter's sources and materials, which remain equally applicable

today:

> Analysis in this area must necessarily begin with the axiomatic principle that the First Amendment occupies a preferred position among the individual rights conferred by the Constitution and that any infringements thereon are closely scrutinized and strictly limited. ***The concept of freedom of the press as guaranteed by the First Amendment is the keystone of our constitutional democracy*** and is ***broad enough to include virtually all activities for the press to fulfill its First Amendment functions***.

389 F.Supp. 1299, 1300-01 (M.D.Fla.1975) (emphasis added); *accord United States v.*

*Fountain View Apartments, Inc.*, 2009 WL 1905046, at *3 (M.D. Fla. 2009) (granting

motion to quash subpoena).

The scope of "activities" covered by the First Amendment reporter's privilege

are generally defined by the analytical framework set forth in the seminal case of *von*

*Bulow by Auersperg v. von Bulow*, 811 F.2d 136 (2d Cir. 1987). There, the court held

that "***whether a person is a journalist***, and thus protected by the privilege, ***must***

***be determined by the person's intent at the inception of the information-***

***gathering process***." *Id.* at 142 (emphasis added). The court further held that "an

individual successfully may assert the journalist's privilege if he is involved in

activities traditionally associated with the gathering and dissemination of news, ***even***

***though he may not ordinarily be a member of the institutionalized press***." *Id.*

(emphasis added).

The court explained that a primary concern is the "deterrent effect" that

compelled disclosure is likely to have on investigative reporting, which "threatens

freedom of the press and the public's need to be informed." *Id*. at 142-43. The court reasoned that "[a] person who gathers information for personal reasons, unrelated to dissemination of information to the public, will not be deterred from undertaking his search simply by rules which permit discovery of that information in a later civil proceeding." *Id*. at 143. Thus, "the talisman invoking the journalist's privilege is intent to disseminate to the public at the time the gathering of information commences." *Id*. at 145.

Courts throughout the country have adopted this standard in determining whether to apply the First Amendment reporter's privilege under various scenarios. *See*, *e.g.*, *Shoen v. Shoen,* 5 *F*.3d 1289, 1293 (9th Cir.1993) (adopting *von Bulow* framework, and extending journalist's privilege to book author engaged in investigative research with intent to disseminate to the public at the inception of information gathering process); *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714–15 (1st Cir. 1998) (adopting *von Bulow* standard in extending privilege to academicians engaged in scholarly research "as long as he intended 'at the inception of the newsgathering process' to use the fruits of his research 'to disseminate information to the public.'"); *In re Madden*, 151 F.3d 125, 128–31 (3d Cir.1998) (adopting *von Bulow* standard); *Bredemus v. Int'l Paper Co.*, 2008 WL 11348492, at *2 (D. Minn. 2008) ("[c]ourts attempting to define the scope of the class benefiting from the journalist's privilege have interpreted the class expansively to include anyone who 'at the inception of the investigatory process, had the intent to disseminate to the public the information obtained through the investigation'") (citations omitted).

In applying this standard, courts have held that "it makes no difference whether the intended manner of dissemination was by newspaper, magazine, book, public or private broadcast or handbill because the press, in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Cohen v. McGuire*, 2016 WL 749951, at *2 (M.D. Fla. 2016) (quashing subpoena) (quoting *In re Madden,* 151 F.3d at 129 (quoting *von Bulow*, 811 F.2d at 142–43). *See also Branzburg v. Hayes*, 408 U.S. 665, 704 (1972) ("liberty of the press is the right of the lonely pamphleteer . . . just as much as of the large metropolitan publisher"). This is because "[t]he purpose of the journalist's privilege was not solely to protect newspaper or television reporters, but to protect the activity of 'investigative reporting.'" *Cohen*, 2016 WL 749951 at *2. The court in *Cohen* went on conclude that if it "were to find that the journalist's privilege does not apply based solely on the method of dissemination of the information, journalists would be hard pressed to determine when they are able to rely upon the privilege and when they are not." *Id.*

Formulaic labels such as "content creator" are therefore irrelevant to the application of the First Amendment reporter's privilege. Nor does it matter that Popcorned Planet's method of disseminating the information it gathers during the investigative process is through an online video platform. The crux of the analysis is simply whether Popcorned Planet, and by extension its investigative reporters, had the "intent to disseminate to the public at the time the gathering of information commenced." *von Bulow*, 811 F.2d at 145. Popcorned Planet, and Mr. Signore, had

precisely that intent, as evidenced by their contemporaneous publishing of daily news videos to the public through Popcorned Planet's entertainment news platform.

## II.    Ms. Lively's Characterization of Coverage as a "Smear Campaign" is Unsupported

### A.    Popcorned Planet Has Always Maintained Editorial and Financial Independence

Ms. Lively attempts to equate Popcorned Planet's critical coverage of Ms. Lively with participation in a retaliatory scheme. This is entirely unsupported by the facts. As the record shows, Popcorned Planet reached out to Ms. Lively's representatives for comment in January 2025, at the same time it reached out to the Wayfarer parties, offering fair participation; they declined. *See* Declaration of Andy Signore, ¶¶ 28-30. Notably, Mr. Signore had no contact with any of the Wayfarer defendants or anyone on their behalf until after Ms. Lively's defamation lawsuit was already filed, belying any suggestion that Mr. Signore or Popcorned Planet were part of the alleged scheme to defame Ms. Lively that forms the basis of her lawsuit. *Id*. at ¶ 23-24.

As the record reflects, Popcorned Planet has not received any payments or compensation of any type from the Wayfarer defendants or anyone on their behalf, nor has any of Popcorned Planet's employees. *Id*. at ¶ 25. Additionally, the Wayfarer defendants and their agents have absolutely no control over the content or editorial decisions of Popcorned Planet, and Popcorned Planet has taken no instructions of any type from the Wayfarer defendants or anyone acting on their behalf regarding its published news content. *Id*. at ¶ 26-28. In sum, contrary to Ms. Lively's suggestion, Popcorned Planet was not commissioned or otherwise enlisted by the Wayfarer

10

defendants or their agents; rather, it was Popcorned Planet that initiated contact with the Wayfarer defendants in January of 2025, after the *Lively v. Wayfarer* lawsuit was already in litigation, at the same time Ms. Lively's representatives were contacted for comment, in accordance with proper journalistic standards. *Id*. at ¶ 28.

B. <u>Popcorned Planet's Coverage of the Lively v. Wayfarer Litigation Represents Only a Small Fraction of Its News Coverage</u>

Popcorned Planet's coverage of the *Lively v. Wayfarer* litigation represents only a small fraction of its overall output and follows the same format as its coverage of other celebrity cases. Specifically, in 2024, Popcorned Planet published a total of 511 news videos, garnering 71,271,058 total views. *See* Signore Declaration, ¶ 20. Out of those 511 total news videos, only 17 mention Ms. Lively, which garnered 2,538,788 views. *Id*. at ¶ 19. Thus, Popcorned Planet's 2024 news coverage involving Ms. Lively accounted for only 3.3% of its total published content, and only 3.5% of its total views. *Id*. at ¶ 21. To date, Popcorned Planet's coverage mentioning Ms. Lively is exceeded by its coverage of the Sean Combs criminal trial alone. *Id*. at ¶ 22.

Furthermore, journalistic criticism of a public figure, even sharp criticism, is not evidence of collusion or bad faith, and deserves no less protection against compelled disclosure. As the court in *Sines v. Yiannopoulos* held, although "[r]espondent's style of disseminating information may be confrontational and biased, [] it is not wholly without journalistic content, and protecting even [r]espondent's muckraking style protects the 'public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters.'" *Sines v. Yiannopoulos*, 2020 WL 6058279, at *6

(S.D.N.Y. 2020) (quoting *Baker v. F & F Investment*, 470 F.2d 778, 782 (2d Cir.1972), *cert. denied*, 411 U.S. 966 (1973)).

C. Popcorned Planet Made Assurances of Confidentiality to Sources Out of Journalistic Necessity

Interviews with crew members and whistleblowers are standard journalistic practice and do not evidence coordination with any party. Forcing Popcorned Planet to "unmask" its confidential sources and whistleblowers would have a chilling effect on the practice of journalism and the free flow of information to the public. *See United States v. Blanton*, 534 F. Supp. 295, 297 (S.D. Fla. 1982) (noting the "'chilling effect' that the enforcement of [] subpoenas [to the press] would have on the flow of information to the press and to the public" and holding that "[t]he compelled production of a reporter's resource materials is equally as invidious as the compelled disclosure of his confidential informants").

The record here demonstrates that all of the sources that provided Popcorned Planet with information regarding the production of the film that was at the center of the *Lively v. Wayfarer* dispute, did so only upon assurances of confidentiality and anonymity. *See* Signore Declaration, ¶ 31. As Mr. Signore testifies, betraying that trust could destroy his business, as well as causing great distress to those who fear that they are in danger for speaking out or that they could be blacklisted in the entertainment industry. *Id.*

Courts deciding the application of the reporter's privilege have routinely held that heightened protection applies where information was provided by sources upon assurances of confidentiality out of journalistic necessity. *See Chevron Corp. v.*

*Berlinger*, 629 F.3d 297, 307 (2d Cir. 2011) (The protection accorded by the privilege, although not absolute, is at its highest when the information sought to be protected was acquired by the journalist through a promise of confidentiality. Forcing the press to breach a promise of confidentiality threatens its ability in the future to perform its public function by impairing its ability to acquire information for publication.") (citations omitted); *Sines*, 2020 WL 6058279, at *3 (same, quoting *Berlinger*); *Pinkard v. Johnson*, 118 F.R.D. 517, 520–21 (M.D.Ala.1987) ("Thus, if information was given to a reporter on a promise of confidentiality, a court would be more reluctant to compel a betrayal of such a confidence. Such betrayal would tend to prevent the reporter from obtaining information later which he could then pass on to the public. Consequently, the public has a heightened interest where disclosure of confidential information is sought.")

## III.    Ms. Lively Fails to Meet the Heavy Burden to Overcome Privilege

Parties seeking to compel disclosure of information protected by the reporter's privilege must satisfy a three-part test to overcome the privilege. First, the information must be "relevant and material to unresolved issues that have been raised in the proceeding for which the information is sought." Fla. Stat. § 90.5015(2)(a). Second, the information must not be obtainable from alternative sources. Fla. Stat. 90.5015(2)(b). Third, there must be a "compelling interest [] for requiring disclosure of the information." Fla. Stat. § 90.5015(2)(c). The test is essentially the same for the First Amendment and common law privileges. *See Gregory v. Miami-Dade Cnty.*, 2015 WL 3442008, at *7 (S.D. Fla. 2015) ("overcoming

the reporter's privilege require[s] that the information be highly relevant, necessary to the proper presentation of the case and unavailable from other sources"). Under all iterations of the privilege, "[o]vercoming the standard is a 'heavy burden' and the standard must be met by clear and convincing evidence." *U.S. v. Thompson,* 2015 WL 1608462 * 1 (S.D.Fla. April 10, 2015) (discussing First Amendment privilege) (citing *McCarty v. Bankers Ins. Co.,* 195 F.R.D. 39, 47 (N.D.Fla.1998)); *see also* Fla. Stat. § 90.5015(2) (requiring a "clear and specific showing" supporting each prong of the statutory test).

Ms. Lively's failure to establish that the information sought is unavailable from other sources is fatal to its effort to compel disclosure of the information sought from Popcorned Planet. Ms. Lively's motion merely confirms that the proper subject of her discovery requests is the party defendants themselves, not Popcorned Planet. Ms. Lively's difficulty in achieving cooperative discovery from the Wayfarer defendants is a matter that should be addressed by motion practice in the originating court, if Ms. Lively so chooses, not by compelling Popcorned Planet to disclose its confidential sources and materials. Courts have routinely pointed to the failure of this prong alone in quashing subpoenas seeking information protected by the reporter's privilege. *See United States v. Caporale*, 806 F.2d 1487, 1504 (11th Cir. 1986) (holding "district court did not err in concluding that the appellants failed to show that [reporter] had information that was unavailable from other sources or necessary to the proper presentation of the case"); *Loadholtz*, 389 F. Supp at 1302 (quashing subpoena on the basis that propounding party had "not even demonstrated

that the information sought could not be gleaned from other sources such as interrogatories directed to or depositions of the defendants themselves"); *Anguillula v. Collier County*, 2009 WL 37623857 (M.D. Fla. 2009) (holding journalist's privilege not overcome where no evidence that information could not be obtained from another source); *United States v. Fountain View Apartments*, 2009 WL 1905046, at *1, 4 (M.D. Fla. 2009) (finding reporter's privilege not overcome by party seeking out-takes of interviews of parties by reporters in housing discrimination law suit where no showing that persons in out-takes were not available to testify).

The cases cited by Ms. Lively regarding this prong of the test are inapposite, as none of them involved *any* iteration of the reporter's privilege or the three-part test for overcoming it. *See* ECF No. 8, pg. 19. The *Landfall 2, Inc. v. Datascore-AI*, 2024 WL 1203273 (S.D. Fla. 2024) merely addressed general third-party discovery in aid of execution of the default judgments at issue in that case. Likewise, *Fed. Trade Comm'n v. Boost Software, Inc.*, 2015 WL 11348282, at *3 (S.D. Fla. 2015) also involved general non-party discovery under Rules 26 and 45. The proposition for which Ms. Lively cites *Tropical Mktg. & Consulting, LLC. v. Glock, Inc.*, 2012 WL 5431002, at *3 (M.D. Fla. Nov. 7, 2012) merely refers to the court's ruling on an objection to a subpoena having nothing at all to do with the reporter's privilege or the three-part test, but involving an entirely separate standard. The same is true of the cases cited in footnote 20 of Ms. Lively's motion—neither involves any iteration of the reporter's privilege. In sum, Ms. Lively has cited no authority for the proposition that she may compel disclosure of materials protected by the reporter's privilege where

that information can be obtained from parties to the litigation, as no such authority exists. As the authority cited by Popcorned Planet above makes clear, this requirement is absolute, and imposes a heavy burden on the party seeking to compel disclosure of information protected by the reporter's privilege—a burden which Ms. Lively has failed to carry.

## IV.   Conclusion

For the reasons set forth herein, and pursuant to the above cited authority, non-party Popcorned Planet respectfully requests this Court deny Blake Lively's Cross Motion to Compel, award Popcorned Planet its reasonable attorney's fees pursuant to Rules 37(a)(4) and 45(d)(1), and grant such other relief as this Court deems just and proper.

Respectfully submitted this 25th day of August, 2025,

*/s/ David P. Mitchell*
**Jeffrey "Jack" Gordon, Esquire**
Florida Bar No.: 836760
**David P. Mitchell, Esquire**
Florida Bar No.: 67249
**MANEY | GORDON TRIAL LAWYERS**
101 East Kennedy Boulevard, Suite 1700
Tampa, Florida 33602
T: (813) 221-1366   F: (813) 223-5920
j.gordon@maneygordon.com
d.mitchell@maneygordon.com

16

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

filed via the CM/ECF system, which will send notice of the foregoing to all counsel of

record.

_/s/ David P. Mitchell_____
**David P. Mithell, Esquire**