UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

POPCORNED PLANET, INC.,

    Movant,

v.                                                                    Case No.: 8:25-mc-28-WFJ-LSG

BLAKE LIVELY,

    Respondent.
_____/

## ORDER

Under Rule 45(d)(3), Federal Rules of Civil Procedure, Popcorned Planet, Inc., moves to quash a subpoena for documents served by Blake Lively, who responds in opposition. Docs. 1–2, 8–12. Because Popcorned Planet fails to establish that the privilege applies (or otherwise waived that privilege) and fails to demonstrate an undue burden, the amended motion to quash, Doc. 2, is denied.

    **I.**     **BACKGROUND**

This matter relates to *Lively v. Wayfarer Studios, LLC, et al.*, Case No. 1:24-cv-10049-LJL, which is pending in the Southern District of New York. Doc. 2 at 1; Doc. 8 at 7. Lively sued in December 2024 and alleged that, during production of the film *It Ends With Us*, she experienced sexual harassment and an organized campaign of retaliation led by her co-star Justin Baldoni. Doc. 8 at 2; *Lively*, Doc. 1 at 42–62. According to the complaint, Baldoni engaged "crisis manager" Melissa Nathan to help Baldoni "get ahead of the narrative" and mitigate bad press generated by

1

Lively's complaints. *Lively*, Doc. 1 at 38–39. The strategy allegedly included "third-party advocates willing to provide a potential quote or engage with reporters" on behalf of Baldoni and others and "the seeding of content on traditional and social media platforms." *Lively*, Doc. 1 at 39, 42.

In an amended pleading, Lively alleges that this campaign continued after the filing of the of her complaint. Doc. 9-2 at 103–09. According to Lively, the defendants "directly engaged with media platforms to overwhelm and confuse the public's understanding of Ms. Lively's allegations and to drive negative sentiment against Ms. Lively and anyone who supports her or speaks out against Mr. Baldoni." Doc. 9-2 at 135. Lively further alleges that this campaign involved statements by the defendants' lawyer Bryan Freedman "who regularly issues inflammatory content to media outlets" and who says "anything, whether true or false, that will harm Ms. Lively's credibility and intimidate others from speaking[.]" Doc. 9-2 at 135. Lively alleges that Mr. Freedman's statements "were published with actual malice, because the [d]efendants know that the core narrative advanced by Mr. Freedman—that Ms. Lively fabricated made-up sexual harassment claims to seize control of the Film—is false." Doc. 9-2 at 137. The defendants allegedly "seeded social media content with content creators, on online chat sites like Reddit, and into publications with small audiences and lax editorial standards; the team would then amplify that content by sharing them" with larger publications. Doc. 9-2 at 147. Among her claims, Livley alleges defamation and defamation *per se* by Baldoni and others "through their agents," including Bryan Freedman, based on their publishing false and defamatory

statements about Lively. Doc. 9-2 at 172–73.

Andy Signore is the founder and CEO of Popcorned Planet, Inc., which he describes as a "publicly accessible news and commentary channel with nearly 1 million subscribers and a large daily viewership, hosted on Popcorned Planet's designated YouTube channel." Doc. 10 ¶ 2. Signore describes himself as Popcorned Planet's "main host," "investigative reporter," and paid employee. Doc. 10 ¶¶ 5–6. Signore claims "extensive experience in journalism and entertainment news reporting." Doc. 10 ¶¶ 8–13. On July 1, 2025, Lively subpoenaed Popcorned Planet for seven categories of information related to the underlying action. Doc. 2-1. The subpoena called for a response by July 23, 2025. Doc. 2-1. On July 25, 2025, Signore moved to quash the subpoena, which he followed with an amended motion to quash on July 29, 2025. Docs. 1–2.

In the amended motion to quash, Popcorned Planet argues that the subpoena seeks material covered by the journalist's privilege, that Lively cannot overcome the privilege, and that the subpoena imposes an undue burden because Lively could obtain the documents from the defendants. Doc. 2. Lively responds that the subpoena does not seek privileged material; that, even if it does, Lively can overcome the privilege; and the subpoena imposes no undue burden.

## II.   APPLICABLE LAW

Rule 45(d)(3)(A), Federal Rules of Civil Procedure, requires quashing or modifying a subpoena "[o]n timely motion" if the subpoena requires disclosure of privileged or other protected matter, if no exception or waiver applies." Under Rule

45(e)(2), a person withholding subpoenaed information under a claim of privilege must "(i) expressly make the claim[] and (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." *See* 9 MOORE'S FEDERAL PRACTICE § 45.61 (3d ed. 2025) ("This echoes the requirements of Rule 26(b)(5) . . . and ensures that a subpoenaed nonparty witness is subject to the same requirements for claiming privilege . . . as is any party to the action."). The party invoking a privilege bears the burden of proving it. *Id.* at § 45.51[3]; *see In re Freeman*, 708 F.2d 1571, 1575 (11th Cir. 1983). A blanket assertion of privilege is insufficient; rather, a party asserting privilege must establish the privilege for each document withheld. *In re Grand Jury Subpoena*, 831 F.2d 225, 226–27 (11th Cir. 1987); *Fed. Sav. & Loan Ins. Corp. v. Hardee*, 686 F. Supp. 885, 886 (N.D. Fla. 1988).

      Rule 501, Federal Rules of Evidence, provides that the federal common law of privilege applies unless the U.S. Constitution, a federal statute, or a federal rule provides otherwise. In a civil case, "state law governs privilege regarding a claim or defense for which state law supplies the rule of decision," such as a case arising under 28 U.S.C. § 1332. *Price v. Time, Inc.*, 416 F.3d 1327, 1335 (11th Cir. 2005) ("State privilege defenses have full force and effect in federal court in diversity jurisdiction."); FED. R. EVID. 501 advisory committee's note to the 1974 enactment. However, "federal law of privilege provides the rule of decision in a civil proceeding where the court's jurisdiction is premised upon a federal question," even if the

information sought is relevant to a pendent state law claim. *Hancock v. Hobbs*, 967 F.2d 462, 466–67 (11th Cir. 1992). Here, the underlying complaint invokes both federal question and diversity jurisdiction but, as to the journalist's privilege, "the 'application of either the federal common law standard or [Florida law] will yield the same result,'" so deciding between the Eleventh Circuit and Florida standards is unnecessary. *Monarch Air Grp., LLC v. Journalism Dev. Network, Inc.*, No. 23-cv-61256, 2025 WL 445491, at *2 (S.D. Fla. Feb. 10, 2025) (citing *Gubarev v. BuzzFeed, Inc.*, No. 1:17-cv-60426, 2017 WL 6547898, at *2 n.1 (S.D. Fla. Dec. 21, 2017)).

The Eleventh Circuit "recognizes a qualified privilege for journalists, allowing them to resist compelled disclosure of their professional news gathering efforts. This privilege shields reporters in both criminal and civil proceedings." *United States v. Capers*, 708 F.3d 1286, 1303 (11th Cir. 2013); *Miller vs. Transamerican Press, Inc.*, 621 F.2d 721, 725 (5th Cir. 1980), *modified on reh'g*, 628 F.2d 932 (5th Cir. 1980).[1] A party can overcome the privilege by demonstrating that the information is relevant and unavailable elsewhere and that a compelling need supports disclosure. *Miller* at 726; *Price*, 416 F.3d at 1343; *accord United States v. Caporale*, 806 F.2d 1487, 1504 (11th Cir. 1986) ("The standard governing the exercise of reporter's privilege as articulated in *Miller*[ ], provides that information may only be compelled from a reporter claiming privilege if the party requesting the information can show that it is highly relevant,

---

[1] *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (Adopting as binding precedent opinions of the former Fifth Circuit Court of Appeals issued on or before September 30, 1981).

necessary to the proper presentation of the case, and unavailable from other sources."). This standard applies even when the source of the information is not confidential. *United States v. Fountain View Apartments, Inc.*, No. 608-cv-891-ORL-35DAB, 2009 WL 1905046, at *2 (M.D. Fla. July 1, 2009) (citing *Loadholtz v. Fields*, 389 F. Supp. 1299, 1302–03 (M.D. Fla. 1975)).

> Under Section 90.5015, Florida Statutes:
>
> A professional journalist has a qualified privilege not to be a witness concerning, and not to disclose the information, including the identity of any source, that the professional journalist has obtained while actively gathering news. This privilege applies only to information or eyewitness observations obtained within the normal scope of employment and does not apply to physical evidence, eyewitness observations, or visual or audio recording of crimes.

Section 90.5015(b) defines a "professional journalist" as someone who regularly engages "in collecting, photographing, recording, writing, editing, reporting, or publishing news, for gain or livelihood" and who obtained the information "while working as a salaried employee of, or independent contractor for, a newspaper, news journal, news agency, press association, wire service, radio or television station, network, or news magazine." Section 90.5015(b) specifically excludes from its coverage book authors and "others who are not professional journalists." *See also State v. Davis*, 720 So. 2d 220, 227 (Fla. 1998) (holding "that a qualified reporter's privilege exists in Florida and that such a privilege extends to both confidential *and* nonconfidential information gathered in the course of a reporter's employment."); *McDermott v. State*, 360 So. 3d 1213, 1215–16 (Fla. 5th DCA 2023) (explaining that even if a privilege existed at common law, the text of the statute governs); Fla. Stat.

§ 90.501. Although Section 90.5015 applies to professional journalists only, the statutory language encompasses journalists working outside of traditional, print media. *See Gubarev v. BuzzFeed, Inc.*, No. 1:17-cv-60426, 2017 WL 6547898, at *4 (S.D. Fla. Dec. 21, 2017) (finding that an online-only news outlet and its reporters successfully invoked the privilege because the outlet qualified as a "news agency," "news journal," or "news magazine" that wrote and published news articles on its website).

Similar to Eleventh Circuit precedent, Section 90.5015(b) requires that a party seeking to overcome the privilege show clearly and specifically (1) that the information is "relevant and material to unresolved issues that have been raised in the proceeding for which the information is sought," (2) that "the information cannot be obtained from alternative sources," and (3) that "[a] compelling interest exists for requiring disclosure of the information."

### III. ANALYSIS

    **a. Popcorned Planet fails to show that the journalist's privilege applies and otherwise waives its claim of privilege.**

Signore formed Popcorned Planet on June 20, 2022, as a Florida for-profit corporation for the purpose of "media production."[2] He reinstated the corporation on October 8, 2025, after an administrative dissolution in 2024. Signore claims that

---

[2] Signore's declaration claims that Popcorned Planet is a 501(c)(3) corporation, but his publicly available records with the Florida Department of State say otherwise. Judicial notice of these public records is appropriate. FED. R. EVID. 201; *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).

he is an "investigative reporter" and receives a salary from Popcorned Planet. Doc. 10 ¶ 5. Signore describes Popcorned Planet as a "publicly accessible news and commentary channel" and himself as "the show's main host." Doc. 10 ¶ 4. Popcorned Planet's "channel" is an account on the website YouTube.com, through which Signore publishes content.[3] Signore describes the channel's content as "news videos" some of which feature legal experts to comment on high-profile court cases involving celebrities. Doc. 10 ¶ 13, 17–21.

Signore claims that he is "unquestionably entitled" to invoke Section 90.5015, Florida Statutes, as well as the common law, federal privilege. Signore asserts that "Florida courts have already determined that the statutory Journalist's Privilege under § 90.5015 applies to internet-based entities, as long as they report the news." Doc. 2 at 8. However, none of the cases cited by Signore[4] determines as much or contains significant analysis of the statutory language. Similarly, Signore claims that

---

[3] Popcorned Planet is little more than a YouTube channel. Although Popcorned Planet maintains a website that operates as an online shop for branded merchandise, Popcorned Planet has no independent website for hosting its video content. Popcorned Planet maintains an online account through the webservice Patreon for fundraising as well as accounts on other social media platforms, such as Facebook, Instagram, and X (formerly known as Twitter). Popcorned Planet's social media links directly to the YouTube channel as its "homepage" and for its content. Popcorned Planet's content, including any paid, exclusive content available through its Patreon or web store, is published and hosted exclusively through YouTube.

[4] Signore's motion contains the wrong citation for *Gubarev v. Buzzfeed, Inc.* Doc. 2 at 8–9 and 12. The order discussing Section 90.5015 is *Gubarev v. Buzzfeed, Inc.*, No. 1:17-cv-60426, 2017 WL 6547898 (S.D. Fla. Dec. 21, 2017). In any event, *Gubarev* is neither controlling nor particularly persuasive on matter of statutory construction. And, as discussed above, *Gubarev* holds that Section 90.5015 contains no language limiting the Florida reporter's privilege to traditional print media; *Gubarev* does not hold that the Florida privilege applies to all Internet-based entities that "report the news." 2017 WL 6547898, at *4.

he is a "professional journalist" as defined in Section 90.5015 but, again, offers no analysis of the statutory language and concludes without explanation that Popcorned Planet satisfies that language. Finally, Signore claims that the content published by Popcorned Planet constitutes "news" because that content is information of public concern, "namely, in the categories of entertainment, culture, and current events." Doc. 2 at 9.

To qualify as a professional journalist under Section 90.5015(b), Signore must regularly engage in the collection and publication of news while working as a salaried employee or independent contractor for "a newspaper, news journal, news agency, press association, wire service, radio or television station, network, or news magazine." *See also Capers*, 708 F.3d at 1303 (explaining that the privilege applies to "professional news gathering."). Yet Signore says nothing about how Popcorned Planet fits within the meaning of these terms.

For example, Popcorned Planet concludes without analysis that Popcorned Planet is the type of employer contemplated by Section 90.5015(b). However, a YouTube channel such as Popcorned Planet is clearly not a "newspaper" or "news magazine" under a plain and ordinary meaning of those terms. *See Price*, 416 F.3d at 1337–42; *Gasson v. Gay*, 49 So. 2d 525, 526 (Fla. 1950) ("Words of common usage, when used in a statute, should be construed in their plain and ordinary signification[.]"); *State v. Debaun*, 129 So. 3d 1089, 1091 (Fla. 3d DCA 2013) ("Where, as here, the legislature has not defined words used in a statute, it is appropriate to refer to dictionary definitions to ascertain the plain and ordinary

9

meaning of a word.").[5] Neither does Popcorned Planet readily fit the terms "news agency," "press association," "wire service," "radio or television station," or "network."[6] That leaves "news journal," which also appears to exclude from its plain and ordinary meaning a YouTube channel.[7]

Even if Popcorned Planet could muster a definition broad enough to cover its YouTube channel, any interpretation must consider the context in which the term appears. Section 90.5015 is precise and clearly intended to exclude certain types of media, as evidenced by the exclusion of book authors and others who are not "professional journalists." The definition of professional journalist includes within its scope professional news organizations, which are distinguished, in part, by the exercise of editorial standards and control. *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). Nothing submitted by Popcorned Planet suggests that its show

---

[5] NEWSPAPER, MAGAZINE, OXFORD ENGLISH DICTIONARY (Online Edition), https://www.oed.com/dictionary/newspaper_n?tab=meaning_and_use#34741259, https://www.oed.com/dictionary/magazine_n?tab=meaning_and_use#38537017 (last visited Nov. 26, 2025).

[6] *See* NEWS AGENCY, WIRE SERVICE, TELEVISION NETWORK, RADIO NETWORK, NETWORK, OXFORD ENGLISH DICTIONARY (Online Edition), https://www.oed.com/dictionary/news-agency_n?tab=meaning_and_use#11314260, https://www.oed.com/dictionary/wire-service_n?tab=meaning_and_use#14108511100, https://www.oed.com/dictionary/television-station_n?tab=meaning_and_use#18846515100, https://www.oed.com/dictionary/network_n?tab=meaning_and_use#34657811, (last visited Nov. 26, 2025); PRESS ASSOCIATION, MERRIAM-WEBSTER DICTIONARY (Online Edition), https://www.merriam-webster.com/dictionary/press%20association?src=search-dict-hed (last visited Dec. 2, 2025).

[7] JOURNAL, PERIODICAL, OXFORD ENGLISH DICTIONARY (Online Edition), https://www.oed.com/dictionary/journal_adj?tab=meaning_and_use#40451448, https://www.oed.com/dictionary/periodical_adj?tab=meaning_and_use#30843161, (last visited Nov. 26, 2025).

practices the editorial standards normally associated with a professional news organization.[8]

Furthermore, although Signore investigates entertainment news and creates content, his position at Popcorned Planet is not the type contemplated in Section 90.5015. Signore says that he is employed by and receives a salary from Popcorned Planet. But he is also Popcorned Planet's owner, founder, and CEO; "the host, director, editor and main producer"; as well as the registered agent of the company, the addresses for which consist of a USPS mailbox and a private residence according to the Florida Department of State.[9] Doc. 10 ¶¶ 2, 5; Doc. 10-1; Doc. 25 ¶¶ 20–21. Thus, Signore is self-employed, and "Florida [c]ourts have historically held that the journalist privilege applies to journalists employed or hired by traditional media outlets." *Techtronic Indus. Co. Ltd. v. Victor Bonilla*, No. 8:23-cv-01734-CEH-AEP, 2024 WL 361247, at *1 (M.D. Fla. Jan. 31, 2024) (finding that "'self-employment' is

---

[8] *See, e.g.*, *Statement of News Values and Principles*, THE ASSOCIATED PRESS, https://www.ap.org/about/news-values-and-principles/ (last visited Nov. 26, 2025); *The BuzzFeed Editorial Standards And Ethics Guide*, BUZZFEED, https://www.buzzfeed.com/buzzfeedstaff/buzzfeed-standards-ethics-guide (last visited Dec. 2, 2025); *Standards & Policies*, DAILY WIRE, https://www.dailywire.com/standards-policies (last visited Nov. 26, 2025); *Editorial Policy*, PEOPLE MAGAZINE, https://people.com/editorial-policy-5499057 (last visited Nov. 26, 2025); *Ethical Journalism: A Handbook of Values and Practices for the News and Opinion Departments*, THE NEW YORK TIMES, Mar. 26, 2025, https://www.nytimes.com/editorial-standards/ethical-journalism.html.

[9] SUNBIZ.ORG - DIVISION OF CORPORATIONS, https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=POPCORNEDPLANET%20P220000502200&aggregateId=domp-p22000050220-8ae0085d-328b-4f34-8a76-204a90df345f&searchTerm=popcorned%20planet&listNameOrder=POPCORNEDPLANET%20P220000502200 (last visited Nov. 26, 2025).

clearly not contemplated in the statutory definition of a professional journalist.").

Additionally, as explained during the first hearing on Popcorned Planet's motion, whether the privilege applies depends not only on whether Signore is employed as a professional journalist but also on whether he was engaged in newsgathering at the time that he obtained the information. Fla. Stat. § 90.5015(2); *Monarch Air Grp., LLC*, 2025 WL 445491, at *2. Even if Signore is employed as a professional journalist within the meaning of the privilege, Signore is not necessarily engaged at all times in professional newsgathering (in the same way that a lawyer is not always engaging in attorney-client communication or working in anticipation of litigation). Signore cannot assert a blanket claim of privilege over his activities but rather must assert that privilege on a document-by-document or item-by-item basis as would any other holder of a constitutional or statutory privilege. *Johnson v. Gross*, 611 F. App'x 544, 547 (11th Cir. 2015) ("Blanket assertions of privilege before a district court are usually unacceptable. . . Instead, [an attorney] must present himself with his records for questioning, and as to . . . *each* record elect to raise or not to raise the defense."). Furthermore, Rules 26 and 45 require a timely and express claim, as well as a disclosure of information sufficient to support his claim.

Here, Lively served the subpoena on July 3, 2025, and Popcorned Planet moved to quash on July 25, 2025, two days after the time required for compliance. Docs. 1, 2-1. As of October 22, 2025, Popcorned Planet had not produced a privilege log identifying responsive but privileged documents and had not sought an extension of time in which to do so. Doc. 18. After requiring the parties to confer about the

12

scope of the search for responsive documents, an October 31, 2024, order, Doc. 21, required Popcorned Planet to produce a privilege log no later than November 5, 2025. Popcorned Planet moved for an extension of time and attached a preliminary privilege log to its motion. Doc. 25. During a November 7, 2025, status conference, I explained to Popcorned Planet that the privilege log was inadequate. For example, in one entry, the log identifies a text string spanning from January 1, 2025, to June 24, 2025. Doc. 25-1 at 1. The "description" that entry, along with every other entry, is a vague, conclusory statement essentially saying that the item is privileged, which provides little basis from which to evaluate the claim of privilege.

In response, counsel for Popcorned Planet argued that it was "nonsense or absurd" to suggest that he had to log or itemize each and every text message subject to the privilege. *Compare Johnson*, 611 F. App'x at 547 (explaining that "when opposing counsel noted that Mr. Froelich had not provided a privilege log or attempted to parse out the communications that would be privileged, Mr. Froelich replied, 'I don't parse it out. That's not my job[.]'"). Consistent with counsel's position that the law does not require particularity and that Popcorned Planet can claim the privilege categorically, the final privilege log filed by Popcorned Planet contains no changes except for the addition of two items. Doc. 34-1.

Counsel for Popcorned Plant is "incorrect on the law, and he fail[s] to show that the subpoenaed communications were privileged." *Johnson*, 611 F. App'x at 547. Popcorned Planet produced no privilege log until ordered to do so three months after receiving service of the subpoena. Thus, Popcorned Planet failed to timely provide a

13

privilege log and, despite repeated opportunities to correct this omission, Popcorned Planet failed to produce a privilege log with sufficient particularity to assess the privilege claim. This results in a waiver of the privilege. *See Nationwide Mut. Fire Ins. Co. v. Kelt, Inc.*, No. 6:14-cv-749-ORL-41, 2015 WL 1470971, at *8–*9 (M.D. Fla. Mar. 31, 2015) (rejecting a categorical privilege log for 136 pages of documents and finding that "[w]hen a party provides an inadequate or untimely privilege log, the Court may choose between four remedies: (1) give the party another chance to submit a more detailed log; (2) deem the inadequate log a waiver of the privilege; (3) inspect *in camera* all of the withheld documents; and (4) inspect *in camera* a sample of the withheld documents."); *Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g, Inc.*, 230 F.R.D. 688, 696 (M.D. Fla. 2005) (finding a waiver of privilege because, among other things, the privilege log "does not provide sufficient information to assess the claim of privilege."); *Mosely v. City of Chicago*, 252 F.R.D. 421, 425–26 (N.D. Ill. Aug. 11, 2008) (finding that a journalist's failure to produce a Rule 45-compliant privilege log waived "whatever claim of privilege" she had); *Johnson v. Ford Motor Co.*, 309 F.R.D. 226, 232–34 (S.D.W. Va. 2015) ("[T]he burden of the party withholding documents cannot be 'discharged by mere conclusory or ipse dixit assertions.'").

    An *in camera* review of documents included in the privilege log demonstrates the problem with Popcorned Planet's generic and conclusory privilege log. For example, item four on the privilege log is a six-month-long, eighty-nine-page text message conversation between Signore and a defendant in the underlying lawsuit. As

one would expect, the conversation contains some information that is clearly irrelevant, unresponsive, and not privileged. The text message conversation constitutes the bulk of the material in the initial privilege log, Doc. 25-1, which contains a mere 142 pages. Yet, the log nowhere specifies the number of individual messages, pages, or specific exchanges to which the privilege allegedly applies. Doc. 25-1 at 1. The final privilege log contains only two additional items, which suggests that the final universe of documents is not much longer than 142 pages. Doc. 34-1. Thus, Popcorned Planet cannot plausibly claim an undue burden in having to separate these documents into their relevant and purportedly privileged parts.

  Even if the inadequate privilege log caused no waiver, Popcorned Planet's production of documents has. A comparison of documents included in the *in camera* inspection with those produced to Lively reveals no discernable, substantive difference. Docs. 25-1, 28. Items five through seventeen and nineteen are inquiries by individuals associated with Popcorned Planet seeking comment from people involved in the film, who provided no substantive response. Doc. 25-1 at 2-4. These e-mails are similar in content and character to the e-mails produced by Popcorned Planet to Lively. Yet Popcorned Planet provides no information about why some inquiries are privileged and other, similar inquiries are not.

  Accordingly, I find that Popcorned Planet fails to establish that the items responsive to the subpoena are protected from disclosure under the journalist's privilege.

### b. Even if Popcorned Planet established that the privilege applies, Lively overcomes it.

Even if Popcorned Planet established that the items sought by Lively fall within the journalist's privilege, Lively can overcome it. Doc. 8 at 22–24. The requests in Lively's subpoena are directly relevant and material to her claim that the defendants in the underlying action orchestrated a campaign to defame her with the help of third parties who created disparaging and false content. *See* Doc. 9-2 at 59–126; 141–44. Furthermore, an *in camera* review reveals that the responsive materials are directly relevant and material to Livley's claim. Lively further establishes that she tried to discover this information from the defendants and, to some extent, has been unable to obtain these materials from them. Lively demonstrates a compelling need because these materials go "to the 'heart of the matter,'" that is, the primary theory underlying Lively's defamation claim. *Carroll v. TheStreet.com, Inc.*, No. 11-cv-81173, 2014 WL 5474048, at *8 (S.D. Fla. Apr. 10, 2014) (explaining that Florida law and the Eleventh Circuit "direct courts to pierce the journalist's privilege in libel cases when a journalist is the defendant and where a plaintiff's need for the information goes to the 'heart of the matter.'").

### c. The subpoena imposes no undue burden on Popcorned Planet.

Popcorned Planet argues that the subpoena imposes an undue burden because the subpoena seeks "extensive document production" and because Lively "has not exhausted more direct avenues to obtain the requested information." Doc. 2 at 17–18. This argument fails for several reasons. During the first hearing on Popcorned

16

Planet's motion to quash, counsel admitted having not discussed the scope of the requests or the attendant search with counsel for Lively. Doc. 18. When given an opportunity to raise objections to the scope of the requests in the subpoena, counsel for Popcorned Planet said, "I don't have a problem with the scope" and affirmed that his only concern was with privilege. Doc. 18. Second, although the undue burden analysis under Rule 45 considers whether the materials are available from another, more convenient source, nothing in Rule 45 requires a party to exhaust all other sources of information before pursuing third-party discovery. *See* Doc. 8 at 24. Even if required, Lively has attempted, unsuccessfully, to obtain the same communications from the defendants in the underlying case. Doc. 8 at 15–17. Accordingly, Popcorned Planet fails to establish that the subpoena imposes an undue burden.

## IV. CONCLUSION

Accordingly, the amended motion to quash, Doc. 2, is **DENIED**, and the initial motion to quash, Doc. 1, is **DENIED AS MOOT**. No later than **December 17, 2025**, the movant Popcorned Planet, Inc., must produce all responsive material to Lively, including every item contained in Popcorned Planet's privilege log, Doc. 34-1, as well as the attachments to those items. To the extent necessary and not already covered by an order in the underlying action, the parties may propose a stipulated protective order governing the handling of this information.

**ORDERED** in Tampa, Florida, on this 2nd day of December, 2025.

_____
LINDSAY S. GRIFFIN
United States Magistrate Judge