IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

POPCORNED PLANET, INC.,

    Movant,

v.                                                      Case No.: 8:25-mc-28

BLAKE LIVELY,

    Respondent,

_____/

**POPCORNED PLANET, INC.'S MOTION FOR DISTRICT COURT REVIEW
OF MAGISTRATE JUDGE'S ORDER DENYING MOTION TO QUASH SUBPOENA**

Movant, Popcorned Planet, Inc., ("Popcorned Planet"), pursuant to Fed. R. Civ. P. 72(a), hereby moves for District Court Review of the Magistrate Judge's Order Denying its Motion to Quash the Subpoena issued by Respondent, Blake Lively ("Lively"), and in support thereof, states as follows:

**I. INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure 72(a), non-party Popcorned Planet, Inc. ("Popcorned Planet") respectfully submits these objections to the December 2, 2025 Order entered by Magistrate Judge Lindsay S. Griffin (ECF No. 37), which denied Popcorned Planet's Amended Motion to Quash a third-party subpoena issued by Respondent Lively.

As set forth more fully below, the Order is contrary to law, internally inconsistent, and clearly erroneous in numerous independent respects. Most fundamentally, the Magistrate Judge:

1. Ignored the First Amendment reporter's privilege altogether, despite extensive briefing and controlling Eleventh Circuit precedent;

2. Misapplied *McDermott v. State*, 360 So. 3d 1213 (Fla. 5th DCA 2023), a case involving a wholly different privilege that exists solely by statute;

3. Imposed extra-statutory requirements nowhere found in the statutory text of the Florida "journalist's privilege," Fla. Stat. § 90.5015;

4. Relied on demonstrably false factual premises regarding Popcorned Planet's operations;

5. Erroneously found waiver of privilege after ordering and conducting *in camera* review;

6. Collapsed the reporter's privilege analysis into generic Rule 45 doctrine, in direct conflict with binding authority; and

7. Compelled production without the clear and specific findings required by statute and constitutional law.

Because Rule 72(a) requires this Court to modify or set aside any portion of a magistrate judge's order that is clearly erroneous or contrary to law, the Order cannot stand.

## II. RULE 72(a) STANDARD OF REVIEW

Under Rule 72(a), a district judge must modify or set aside any portion of a magistrate judge's order on a nondispositive matter that is "clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a). An order is contrary to law where it:

- Applies the wrong legal standard;
- Fails to apply controlling precedent;
- Misconstrues a statute; or
- Ignores constitutional protections.

An order is clearly erroneous where it rests on unsupported factual findings or where the reviewing court is left with a "definite and firm conviction that a mistake has been committed." Both standards are met here—repeatedly.

## III. THE ORDER IS CONTRARY TO LAW BECAUSE IT FAILS TO ADDRESS THE FIRST AMENDMENT REPORTER'S PRIVILEGE

### A. The First Amendment Privilege Was Squarely Raised and Briefed

2

Popcorned Planet's Amended Motion to Quash expressly invoked three distinct iterations of the reporter's privilege: (i) Florida statutory Journalist's Privilege, aka Florida Shield Law, Fla. Stat. § 90.5015; (ii) Florida common-law reporter's privilege; and (iii) the First Amendment reporter's privilege, as recognized by the Eleventh Circuit. *See* Amended Motion to Quash, (ECF No. 2) at pgs. 4–8.[1]

The most fundamental error in the subject Order (ECF No. 37) is its complete failure to analyze the First Amendment reporter's privilege, despite that privilege being explicitly asserted, extensively briefed; and supported by binding Eleventh Circuit authority. Federal courts have long recognized that the First Amendment protects the act of newsgathering itself, not merely institutional press entities. As the Supreme Court famously observed, "the liberty of the press is the right of the lonely pamphleteer just as much as of the large metropolitan publisher." *Branzburg v. Hayes*, 408 U.S. 665, 704 (1972).

Federal courts routinely hold that the First Amendment reporter's privilege applies to non-traditional journalists; it is determined by function and intent, not medium or label; and it exists independently of state shield laws. *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136 (2d Cir. 1987) (application of First Amendment reporter's privilege is determined by intent to disseminate to the public at the inception of newsgathering process); *Cohen v. McGuire*, 2016 WL 749951, at *2 (M.D. Fla. 2016) (application of First Amendment reporter's privilege is not limited based on the method utilized to disseminate information); *Gubarev v. Buzzfeed, Inc.*, 2017 WL 6547898, at *4 n.2 (S.D. Fla. 2017) (holding that even if media outlets claiming privilege were "not covered by Florida's Shield Law, they would still be protected under the First Amendment

---

[1] The Order even omits the First Amendment reporter's privilege from its statement summarizing the privileges claimed in the Amended Motion to Quash, stating "Signore claims that he is 'unquestionably entitled to invoke Section 90.5015, Florida Statutes, as well as the common law, federal privilege." ECF No. 37, at pg. 8.

privilege" (citing *Price v. Time, Inc.*, 416 F.3d 1327, 1343 (11th Cir. 2005)). The Order's silence on this doctrine is not harmless—it is dispositive.

### B. Misuse of *McDermott v. State* to Eliminate a Constitutional Privilege

The Order cites *McDermott v. State*, 360 So. 3d 1213 (Fla. 5th DCA 2023), for the proposition that "even if a privilege existed at common law, the text of the statute governs." Order at 6. That holding is inapposite here. The Order's reliance on *McDermott v. State* is especially problematic because it reflects a category error. To begin with, *McDermott* is a criminal case that did not involve any iteration of the reporter's privilege. Rather, the case involved a dispute over whether a criminal defendant's statements to a volunteer layman at a church, admitting to the sexual abuse of a child, were protected by the clergy communications privilege. *Id*. at 1215-16. The *McDermott* court explained that "the only privileges recognized under Florida law are those established by The Florida Evidence Code, any other statute, the federal or Florida constitutions, and the Florida Supreme Court pursuant to its rule making authority." The court held that even if a common law privilege once existed, "the Florida evidence code is [now] the sole source of [] the clergy communications privilege," and therefore, "the text of the statute governs" in the event of an inconsistency between the common law and statutory language. *Id*. at 1216.

Unlike the clergy communications privilege at issue in *McDermott*, which exists solely as a creation of the Florida evidence code, the First Amendment reporter's privilege was established by the federal Constitution. Thus, the Florida evidence code is *not* the only source of the reporter's privilege, and the statutory text of the journalist's privilege statute does not govern as to any aspect of the First Amendment privilege, including its scope and application.

The Magistrate Judge's apparent assumption that the statutory definition of "professional journalist" governs *who may invoke* the First Amendment privilege is legally unsupportable.

4

Federal courts in Florida have expressly rejected that notion, holding that failure to qualify under § 90.5015 does not defeat First Amendment protection. Indeed, the relevant authority regarding the reporter's privilege makes clear that the First Amendment reporter's privilege and the Florida statutory Journalist's Privilege (aka Florida Shield Law) exist simultaneously, to offer the broadest protection. *See Gubarev v. BuzzFeed, Inc.*, 2017 WL 6547898, at *4 (S.D. Fla. Dec. 21, 2017) ("Even if the defendants were not covered by Florida's Shield Law, they would still be protected under the First Amendment privilege") (citing *Price v. Time, Inc.*, 416 F.3d 1327, 1343 (11th Cir. 2005)). By implying that the text of a Florida statute can override a federal constitutional privilege, the Order is clearly erroneous and should be set aside.

C. **The First Amendment Privilege Applies Under a Functional Test**

As thoroughly outlined by Popcorned Planet in its Response to Lively's Cross Motion to Compel (ECF No. 12, at pgs. 6-10), the First Amendment reporter's privilege applies based on function, not formal labels. The benchmark test for determining whether the First Amendment reporter's privilege may be invoked—known as the *von Bülow* test—evaluates whether the person asserting the privilege intended to disseminate information to the public at the inception of the newsgathering process. *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 142 (2d Cir. 1987). Pursuant to Fed. R. Civ. P. 10(c), Popcorned Planet adopts by reference the portion of its Response to Lively's Cross Motion to Compel addressing the functional *von Bülow* test utilized by courts in considering the application of the First Amendment reporter's privilege. *See* ECF No. 12, at pgs. 6-10. Popcorned Planet easily satisfies this test, as established by sworn testimony and uncontested record evidence. *Id*.

The Order's failure to apply this test in concluding that Popcorned Planet is not entitled to protection from the non-party subpoena is clearly erroneous, and the Order should accordingly be set aside by this Court.

IV. **THE ORDER ERRONEOUSLY CONCLUDES THAT POPCORNED PLANET DOES NOT QUALIFY UNDER FLA. STAT. § 90.5015**

A. **The Order Relies on Factually Incorrect Assertions**

Footnote 3 of the Order states that Popcorned Planet is "little more than a YouTube channel." ECF No. 37, pg. 8, n. 3. The Order further states that "[a]lthough Popcorned Planet maintains a website that operates as an online shop for branded merchandise, Popcorned Planet has no independent website for hosting its video content" and that "Popcorned Planet's content, including any paid, exclusive content available through its Patreon or web store, is published and hosted exclusively through YouTube." *Id*.

Both assertions are false. Popcorned Planet is registered with the Florida Department of State as a for-profit corporation, and is recognized as a registered trademark by the United States Patent and Trademark Office ("USPTO"), where it is described as providing production and distribution of television-style news programming, and "[p]rovision of non-downloadable films and television programmes via a video-on-demand service."[2] Examination of its website demonstrates that the video content provided on the website under the "Documentaries" and "Exclusive Content" menu headings are *not* hosted on YouTube.[3] Although some of the videos posted on the website are hosted by YouTube, the larger projects such as documentaries as well as

---

[2] *See* USPTO TSDR Document Viewer, Popcorned Planet Trademark Registration Certificate, available at https://tsdr.uspto.gov/documentviewer?caseId=sn98929324&docId=ORC20251225045508&linkId=1#docIndex=0&page=1 (last accessed January 07, 2026).

[3] *See* Popcorned Planet Website Homepage, available at https://popcorned-shop.fourthwall.com (last accessed January 07, 2026).

bonus news content are hosted through Popcorned Planet's website using a paid video-on-demand hosting service. It is axiomatic that an order based on materially incorrect facts is clearly erroneous.

Moreover, the fact that Popcorned Planet offers branded merchandise on its website in no way supports a finding that it does not qualify for protection under the Florida statutory privilege. On the contrary, as explained below, Popcorned Planet's sale of branded merchandise is a factor that weighs in favor of its entitlement to claim the statutory privilege.

### B. The Order Misconstrues the Term "Network"

The definition of "professional journalist" under Section 90.5015(1)(a) expressly includes journalists working for a "network." The statute does not define that term and does not limit it to legacy broadcast television. The Order summarily concludes that Popcorned Planet does not fit any of the terms listed under 90.5015(1)(a) but provides no analysis whatsoever of any of the terms, offering only footnotes with URL links to the dictionary definition of each term in the Oxford English Dictionary. However, all of the linked definitions are behind a paywall, and the Order does not quote or summarize the actual definitions at each link. Notably, the Order provides no analysis or discussion of what constitutes a "network" and simply assumes—without authority—that a digital, multi-platform news operation like Popcorned Planet cannot qualify as a "network" based on the plain and ordinary meaning of that term.

Critically, the statute does not define "network," nor does it restrict the term to over-the-air broadcast television or cable television networks. The absence of any such limitation here reflects legislative intent to adopt a functional, medium-neutral definition, consistent with evolving methods of news distribution. A "network" is fundamentally defined as any "interconnected or interrelated chain, group, or system." [4] The most ubiquitous modern example of a network is the

---

[4] NETWORK Definition & Meaning | Dictionary.com, available at https://www.dictionary.com/browse/network (accessed January 07, 2026)

internet. As such, in modern media ecosystems, YouTube and other similar internet-based platforms function as a distribution infrastructure, much like broadcast spectrum or cable systems did for legacy networks. For these reasons, a YouTube and hosted video-on-demand based entertainment news channel qualifies as a "network" where it demonstrates regular publication of news or commentary of public interest (including entertainment industry reporting), systematic digital distribution to a large audience of devices connected through the internet, and brand continuity and audience recognition, functioning as a unified media outlet rather than an isolated individual post. Popcorned Planet satisfies all of these factors.

Moreover, interpreting "network" to exclude YouTube-based or digital-first news organizations would arbitrarily privilege legacy media over modern "new media" journalism, chill investigative reporting conducted by independent digital outlets, conflict with First Amendment principles of platform neutrality, and effectively render the statute technologically obsolete. Florida courts avoid statutory interpretations that lead to absurd results or that undermine the statute's remedial purpose. In summary, the statute's medium-neutral language, lack of strict technological or platform specific limitations, and its remedial purpose, together with the realities of modern digital journalism and internet-only news content, all weigh in favor of finding that Popcorned Planet qualifies as a "network" under Section 90.5015(1)(a). The Order's conclusory finding that Popcorned Planet does not fall within the statutory definition, without any analysis whatsoever, constitutes error warranting vacatur.

C. The Order Imposes an Extra-Statutory "Editorial Standards" Requirement

The Order emphasizes that Popcorned Planet submitted nothing to "suggests its show practices editorial standards normally associated with a professional news organization." ECF No. 37, pg. 10-11. In a footnote, the Order cites a series of URL links to "editorial standards" webpages

for various media outlets. However, the Order cites no authority for the proposition that absence of a publicly posted "editorial standards" webpage disqualifies a media outlet from entitlement to protection under the Florida statutory privilege. Moreover, nothing in the text of § 90.5015 requires a formal editorial standards document, a dedicated editorial standards webpage, or institutional trappings of legacy media. The statute requires only that a journalist be "regularly engaged" in news gathering for gain or livelihood.

In addition, the case cited in the Order for the proposition that the exercise of editorial standards are a hallmark of professional news organizations—*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)—does not even involve the Florida statutory shield law, § 90.5015. Furthermore, the term "professional news organization" is not even one of the terms listed under Section 90.5015(1)(a). As such, the Order's entire analysis on this point is inapposite, as requirements from unrelated cases cannot be imported into a statute for the purpose of limiting its scope.

Finally, notwithstanding the absence of any editorial standards and control requirement, and contrary to the Order's representation that no such showing was made, sworn testimony introduced in this matter establishes that Popcorned Planet does indeed maintain editorial control and journalistic standards. *See* Signore Decl. (ECF No. 10), ¶¶ 26, 28.

### D. Ownership Status Is Legally Irrelevant

The Order disqualifies Mr. Signore because he is the owner and CEO of Popcorned Planet. *See* ECF No. 37, at pg. 11. Section 90.5015 contains no ownership exclusion. Many undisputed journalists—past and present—are founders, owners, or editors-in-chief of their outlets. The statute protects journalists, not corporate organizational charts. This flawed reasoning is unsupported by law or logic, and constitutes grounds for vacatur of the Order.

## V. THE ORDER ERRONEOUSLY FINDS WAIVER OF THE REPORTER'S PRIVILEGE

### A. Moving to Quash Does Not Require a Document-by-Document Log

The Order holds that Popcorned Planet waived privilege by failing to provide a sufficiently granular privilege log at the outset. That conclusion is contrary to authority involving claims asserting reporter's privilege. Courts have repeatedly held that where a journalist moves to quash a subpoena in its entirety based on privilege, failure to provide a document-by-document log at the outset is not required, and does not constitute waiver. *See Marshall Project, Inc. v. City of Cleveland*, 2024 WL 4589667, at *6 (S.D.N.Y. 2024) ("Although Rule 45(e)(2)(A) requires non-parties to provide a privilege log, there is no relevant case law in this Circuit holding that the press waives its journalist's privilege by failing to produce a privilege log *when it has moved to quash the entire subpoena for a single reason: all the requested materials are subject to the journalist's privilege*"); *Schoolcraft v. City of New York*, 2014 WL 1621480, at *5 (S.D.N.Y. 2014) ("The 'heavy costs of subpoena compliance' would be a significant issue if reporters have to immediately prepare a privilege log upon being served with a subpoena"); *Chestnut v. Kincaid*, 2022 WL 350117, at *2–3 (D. Md. 2022) ("While the assertion of privilege is normally presented in the form of a privilege log, [] it need not take that form," and finding no waiver as media outlet provided defendants "with information about the specific privilege being asserted and contended that it applied to the full request").

### B. The Order Erroneously Finds Waiver Based on Inadequate Descriptions

The Order erroneously states that the descriptions in the privilege log are inadequate, resulting in waiver of any claimed privilege. ECF No. 37, pgs. 13-14. The order characterizes the descriptions as "vague, conclusory statement … which provides little basis from which to evaluate the claim of privilege." Id. at 13. It later states "despite repeated opportunities to correct this

omission, Popcorned Planet failed to produce a privilege log with sufficient particularity to assess the claim of privilege." First, the Order misunderstands the constraints that must be observed in preparing privilege logs involving the reporter's privilege. Unlike privilege logs involving other forms of privilege, a privilege log asserting a reporter's privilege claim must necessarily limit the extent of information provided in order to avoid disclosing the information that is protected by the privilege. That includes any information that could potentially reveal the identity of sources or the privileged information itself. Federal courts regularly recognize this exception for privilege logs invoking reporter's privilege. *See Chestnut v. Kincaid*, 2022 WL 350117, at *2–3 (D. Md. 2022) ("Information as basic as the identity of those involved in the recordings may be protected by privilege" and therefore "failing to provide greater information here did not constitute a waiver of such privilege because the New Yorker's basis for response was to avoid 'revealing information itself privileged or protected'") (citing Fed. R. Civ. P. 26(b)(5)(A)(ii). Finally, any alleged inadequacy in the descriptions in the privilege log were rendered moot by the Magistrate Judge's decision to conduct an *in camera* review of all of the documents identified on the privilege log. As such, the descriptions were no longer necessary for the intended purpose of evaluating the privilege claim, as the Magistrate Judge had reviewed the actual documents themselves. *See* section V(D), below.

### C. The Order Misunderstands the Nature of the Newsgathering Process and Protection of Sources

The Order erroneously restricts the scope of materials considered to be part of the newsgathering process. To wit, the Order criticizes the fact that the privilege log identifies the six-month long text message chain identified as item 4 on the privilege log as a single entry, stating that it "contains some information that is clearly irrelevant, unresponsive, and not privileged." ECF No. 37, pg. 15. The Order also states that "the log nowhere specifies the number of individual

11

messages, pages, or specific exchanges to which the privilege applies." Contrary to the court's conclusion, the privilege applies to the entirety of the conversation. The court's ruling fails to understand the nature of the newsgathering process, and specifically the cultivation of sources, which includes casual conversation, socializing, and other informalities that do not directly involve questions and answers on a given subject. *See Sines v. Yiannopoulos*, 2020 WL 6058279, at *5 (S.D.N.Y. 2020) ("Movants ask the Court to discredit Respondent's assertion that he attended the afterparty with a journalistic intent because Respondent claims to have consumed significant amounts of alcohol at the party. The Court notes that the consumption of alcohol at a party does not vitiate journalistic intent. Journalists may wish to attend a party in order to gather information, or to meet and cultivate potential sources, any of which goals may be furthered by the consumption of alcohol") (cleaned up).

Being forced to parse out certain messages/communications with a confidential source as "not privileged" would result in the disclosure of the source's identity, thereby defeating the very purpose of the reporter's privilege.

### D. Waiver Cannot Be Found After *In Camera* Review

Here, the Magistrate Judge ordered *in camera* review of all documents listed on Popcorned Planet's original privilege log, subsequently ordered an *in camera* review of file attachments to the text message chain listed as item number four on the privilege log, and only then, after completing the *in camera* review, found that waiver had occurred. That sequence is legally irreconcilable. To wit, the Order cites *Nationwide Mut Fire Ins. Co. v. Kelt*, 2015 WL 1470971 for the proposition that "when a party provides an inadequate or untimely privilege log, the Court may choose between four remedies: (1) give party another chance to submit a more detailed log; (2) deem the inadequate log a waiver of the privilege; (3) inspect *in camera* all of the withheld

documents; (4) inspect *in camera* a sample of the withheld documents." In this case, the Magistrate Judge elected to inspect *in camera* all of the documents identified on the privilege log. Once the court has elected to inspect the documents *in camera*, the alleged inadequacy of the descriptions in the privilege log is moot, as the descriptions are no longer necessary to evaluate the privilege claim, as that determination is more appropriately made based on the court's review of the actual documents during the *in camera* inspection. There is no logical reason that a finding of waiver based on inadequate descriptions on a privilege log can appropriately be made after the court has physically reviewed the actual documents identified on the log.

## VI. THE ORDER ERRONEOUSLY CONCLUDES THAT THE PRIVILEGE WAS OVERCOME

### A. No Evidentiary Hearing Was Held

Both the Florida statute and the First Amendment require a clear and specific showing to overcome the privilege, supported by evidence and specific findings. *See, e.g.*, § 90.5015(3). No evidentiary hearing was held. No evidence was submitted by Lively in support of any argument that the privilege could be overcome. And no specific evidentiary findings regarding the test for overcoming the privilege were made in the Order. This alone requires vacatur.

### B. Unsupported Assertions Regarding Alternative Sources

The Order repeatedly asserts that Ms. Lively attempted unsuccessfully (including with qualifying language "to some extent") to obtain the information from party defendants. ECF No. 37, at pgs. 16-17. There is *no evidentiary support* for this claim. Indeed, Popcorned Planet submitted judicially noticeable materials demonstrating that the same categories of documents were sought and obtained from the defendants in the underlying SDNY action. In response, Lively's counsel argued at the subsequent hearing that the discovery materials in the SDNY action were placed under seal by the district court, and therefore, Popcorned Planet did not have access

13

to the documents in order to demonstrate precisely what discovery had been requested and what materials had been produced in response, essentially utilizing the sealed documents as both a sword and a shield. Lively never submitted any of the sealed discovery materials to the Magistrate Judge, even for *in camera* inspection, nor did she offer to make any such proffer. As such, the Order erroneously relies on nothing more than the unsupported representations of counsel for Lively in finding that Lively overcomes the privilege, and should accordingly be vacated.

Lastly, the Order cites *Carrol v. TheStreet.com*, 2014 WL 5474048 (S.D. Fla. 2014) as authority for its conclusion that Lively has overcome the privilege. ECF No. 37, pg. 16. Notably, however, the quoted language from *Carrol* stands for the proposition that the law "directs courts to pierce the journalist's privilege in libel cases *when a journalist is the defendant* and where a plaintiff's needs for the information goes to the 'heart of the matter'") (emphasis added). Popcorned Planet is *not* the defendant in this matter; rather, Popcorned Planet is a non-party, and thus entitled to protection from exactly this type of burdensome fishing expedition.

### VII. THE ORDER MISAPPLIES RULE 45 UNDUE BURDEN ANALYSIS

The Order treats undue burden as waived because counsel did not object to scope. That is not the Rule 45 standard, particularly where a non-party journalist is involved. Even facially reasonable subpoenas may impose undue burden when they compel disclosure of privileged materials; chill newsgathering; or force journalists to serve as discovery proxies. Popcorned Planet submitted declarations detailing the extent of the burden it sustained as a result of Lively's subpoena, including significant disruption to its business operations as a result of the extensive hours Signore and his employees were required to spend complying with the Magistrate Judge's directives regarding the preparation of the privilege log and the search and review of potentially responsive materials. Notably, bad faith is not required in order to find that a non-party has been

14

subjected to undue burden under Rule 45, and "even a good faith violation of the Rule 45's requirement to avoid imposing an undue burden is subject to sanctions under the rule." *See BMO Harris Bank, N.A. v. Richert Funding, LLC*, 2017 WL 11627485, at *10–11 (N.D. Ga. 2017).

## VIII.   CONCLUSION

The Magistrate Judge's Order is contrary to law and clearly erroneous at virtually every stage of the analysis. It disregards constitutional protections, misstates facts, adds requirements not found in the statute, and compels disclosure without the findings required by law. For the reasons set forth above, Popcorned Planet respectfully requests that the Court vacate the Order in its entirety.

Dated: January 08, 2026                        Respectfully submitted,

*/s/ David P. Mitchell*
**Jeffrey "Jack" Gordon, Esquire**
Florida Bar No.: 836760
**David P. Mitchell, Esquire**
Florida Bar No.: 67249
**MANEY | GORDON TRIAL LAWYERS**
101 East Kennedy Boulevard, Suite 1700
Tampa, Florida 33602
T: (813) 221-1366   F: (813) 223-5920
j.gordon@maneygordon.com
d.mitchell@maneygordon.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed via the CM/ECF system, which will send notice of the foregoing to all counsel of record.

*/s/ David P. Mitchell*
**David P. Mithell, Esquire**