IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

POPCORNED PLANET, INC.,
Movant,
vs
BLAKE LIVELY,
Respondent.

Civil Docket
No. 8:25-mc-28-WFJ-LSG

**STATUS CONFERENCE HEARING**

Heard in Courtroom 9B
Sam M. Gibbons United States Courthouse
801 North Florida Avenue
Tampa, Florida 33602
Thursday - November 13, 2025
3:00 p.m. - 3:44 p.m.

BEFORE THE HONORABLE LINDSAY SAXE GRIFFIN

UNITED STATES MAGISTRATE JUDGE

LORI ANN CECIL VOLLMER, CSR, RPR
Federal Official Court Reporter
Sam M. Gibbons United States Courthouse
801 North Florida Avenue, Room 1221
Tampa, Florida 33602
Lori_CecilVollmer@flmd.uscourts.gov
(813) 301-5336

Proceedings transcribed via courtroom digital audio recording by a court reporter using computer-assisted transcription.

# APPEARANCES

PRESENT ON BEHALF OF THE MOVANT,
POPCORNED PLANET, INC.:

MR. JEFFREY LEE GORDON and
MR. DAVID P. MITCHELL,
MANEY & GORDON, PA
101 East Kennedy Boulevard
Suite 3170
Tampa, Florida 33602-5151
(813) 221-1366
j.gordon@maneygordon.com
d.mitchell@maneygordon.com

PRESENT ON BEHALF OF THE RESPONDENT,
BLAKE LIVELY:

MS. MERYL CONANT GOVERNSKI,
DUNN ISAACSON RHEE LLP
401 Ninth Street, N.W.
Suite 800
Washington, DC 20004
(202) 240-2900
mgovernski@dirllp.com

ALSO PRESENT:

Mr. Andy Signore

PROCEEDINGS

(Open court.)

(Court called to order.)

COURTROOM DEPUTY: Good afternoon.

This Court calls ***Case No. 8:25-mc-28-WFJ-LSG, Popcorned Planet, Incorporated versus Lively***.

THE COURT: All right. Good afternoon, everybody.

I'll hear appearances from counsel, please.

MR. GORDON: Good afternoon, Judge.

Jack Gordon and my law partner Dave Mitchell on behalf of Popcorned Planet. Mr. Signore is also here with us at the hearing today.

THE COURT: Great. Thank you, all.

MS. GOVERNSKI: Good afternoon, your Honor.

Meryl Governski on behalf of Ms. Lively.

THE COURT: Thank you, Ms. Governski.

All right. So we're here just for a brief status. I have a couple of questions and things to raise and then I'll -- I'll let the parties raise anything they wish to.

So, Mr. Gordon, on the -- thank you for providing the -- the documents for in camera review.

I did note that one of the documents has -- appears to have several attachments, No. 4 in the privilege

log at 25-1. Those -- those attachments will need to be -- I'll need to look at those as well and they'll need to be logged if they're considered privileged as -- as well. I don't -- again, I think there's several of them. It's a very long text chain, but those attachments will need to be separately provided.

MR. GORDON: Yes, your Honor.

THE COURT: Okay. All right. So the next thing I wanted to ask about was the hit report that was produced. Thank you for providing that information.

And I don't know if Mr. Gordon or Mr. Mitchell, you wanted to speak to this, but I'm going to refer to 31-1, which is the amended exhibit that was provided. I wanted to just ask if you could give me a little bit of direction here just in terms of it looks like there are many hits in some of these categories and then there's kind of some comments at the top.

I guess just this gets to the question I asked at the last status conference. What's the -- what's the size or scope of the documents you're reviewing. I see again, like, it looks like there's -- if you look at the total hits, there's -- and you add those all up, there's probably over 10,000 hits, but what's -- what's the number of documents that you're reviewing or that you've -- you've collected that you're still reviewing? That's --

MR. GORDON: Those -- those -- those -- and I promise the Court the last thing I want to do is whine or vent, but it's going to sound like it.

I can attest to the number of hours -- and -- and I think the Court already fully appreciates the fact that I don't have any technological skill whatsoever, right? So Mr. Mitchell has been spending just an inordinate number of hours over the course of the past couple of weeks as well with Mr. Signore.

It's just incredibly burdensome. And again, I apologize because I don't want to -- if it comes out of my mouth, it's going to sound like C-3PO and R2-D2, but -- but Mr. Mitchell should be able to explain specifically the programs utilized and the nature and scope of just how much stuff we've gone through.

THE COURT: Okay. Yeah. I just want to know how much -- how much you have, what you've gone through, what remains to be done and if you can put that into some sort of specific numbers, that would be super helpful. And again, this hit report is helpful. I just wanted to put that in context.

So Mr. Mitchell?

MR. MITCHELL: Yes, your Honor.

I guess if you're question is what is still left to cull from these search results, these hits that

were run on each of these search terms and each of the repositories --

THE COURT: Well, let's -- let me -- I'm sorry to interrupt you. Let -- let me back up.

MR. MITCHELL: Sure.

THE COURT: In terms of these hits, how -- what's the size of -- of the -- of the documents? Like, what's the size of the information just with the hits alone?

Like, what did -- what are the -- do you have a number documents? Do you have a file size? Like, what --

MR. MITCHELL: They're not in document form yet, your Honor --

THE COURT: Okay.

MR. MITCHELL: -- since they're still in negative raw format. Either -- whether it would be, you know, for instance Gmail --

THE COURT: Okay.

MR. MITCHELL: -- and I know -- let me -- I don't want to get ahead of myself here, but I'll -- I'll tell you from having discussed with eDiscovery vendors that we spoke to, which we did provide some quotes there --

THE COURT: Yes.

MR. MITCHELL: -- I have a greater understanding

for how the eDiscovery process works through the third-party vendors. We don't have the tools that are available to them for searching some of this information.

So, for instance, Gmail, I was -- it was described to me the following way; a request is made for the raw data, even though it's web mail, Google will provide a bucket, they call it, that would, for instance, cover a certain time period. Then that's hosted and -- in a eDiscovery platform like Google Vault and that's when the search terms are run against it.

It's much like an SQL search is run on a -- you know, SQL queries are run on a normal database. Since we don't have access to that, the search that was done for Google was simply running the search using the native search function in the top of the Gmail window.

THE COURT: Okay.

MR. MITCHELL: And then as you can see, if you ever run a search in Gmail, you'll see, you know, line items that come back as responsive to that. So those are in document format.

As far as some of the others where, for instance, Meta does allow you to request your data in HTML or -- or Java format, they're notoriously slow, as I understand it, at responding to that. So we do have some of that and some of that's been searched. So it's in HTML format. Again,

not in document format, but, you know, it's -- it's a format that could easily be converted to documents. some of it, we don't have. Some, we had to use again the Native search functions, much like Gmail, and in which case we're only seeing in the web interface.

THE COURT: Okay.

MR. MITCHELL: So I don't know if that answers your question, but it's not in document format yet. It's still, you know, Native, either web-based or in HTML or Java format.

THE COURT: Okay. So you've -- you've run the searchs, but not necessarily col- -- I guess collected all of it and put it in one spot where you can --

MR. MITCHELL: Right.

THE COURT: -- search through it? Yeah.

MR. MITCHELL: Exactly.

THE COURT: Okay.

MR. MITCHELL: I mean, to turn all of that into actual PDFs, as you can see from the numbers of hits that came back from some of these, they're in the thousands, like you said, we'd be dealing with a pretty massive PDF file, I think. So no, it hasn't been converted to that yet.

THE COURT: Okay. And these notes that you have --

MR. MITCHELL: Only the ones that -- only the ones that we've provided to the Court in -- in the in camera binder, those were converted to --

THE COURT: Okay.

MR. MITCHELL: -- to PDF.

THE COURT: Okay. Understood.

And the notes that are along the top of this Page 3 of Document 31-1, those sort of explain what -- what you were -- a little bit about what you were saying to me --

MR. MITCHELL: Right.

THE COURT: -- just a moment ago of how the search --

MR. MITCHELL: Exactly.

THE COURT: -- was done and what -- what you turned up.

MR. MITCHELL: Correct.

THE COURT: It's like the current status, I guess?

MR. MITCHELL: Right, exactly.

As it says in -- for -- for some of those, like, the WhatsApp, it shows that we're -- we're waiting on the request that Meta HTML export. Some of them, they're, I guess, within the Meta universe like Facebook. I believe we do have those. But -- but it's all here. It's all described, what we have and what we're waiting for. And

for those that we don't have the actual raw data extracts for, we just did the manual search using the web interface.

THE COURT: Okay. And can you -- I guess with reference to these particular categories, what -- what remains to be reviewed?

It looks like, for identification, you've got in the first three or four columns -- it looks like you've got either exports or other searches that have been done. How -- how much of that remains to be sort of reviewed and looked through by counsel?

MR. MITCHELL: Well, the -- the -- the term- -- the repositories have all been searched and indexed by hit. So that's all here. I mean, there aren't any more hits that are going to come back from these search terms on any -- you know, for instance, on the right side of the document where you'll see a Discord Popcorned Planet, there's a bunch of zeros, that's not because it hasn't been searched, it's because none of the search terms resulted in a hit for that term.

THE COURT: Oh, I understood. I guess just the hits --

MR. MITCHELL: Correct.

THE COURT -- aren't necessarily responsive documents --

MR. MITCHELL: Exactly.

THE COURT: -- that could --

MR. MITCHELL: Agreed. So --

THE COURT: No, I -- that -- in terms of that, review, like, how much of that remains to be done?

MR. MITCHELL: There -- there's still some review to do.

And -- and I'll explain, your Honor, the -- when we initially prepared the privilege log, when we were under the, I guess, arrant assumption that the cutoff time we were dealing with consistent with the New York Court's February 18th cutoff, I believe we were current through -- we had obtained everything that was responsive and privileged up until that point.

After the last hearing when your Honor stated that the -- that wasn't the cutoff date that we were going to use here and we needed to, you know, extend it toward -- all the way up to the subpoena compliance date, which is in the subpoena states present and under the Middle District case law for a Rule 45 subpoena, present means the date of compliance since there's not an ongoing supplement due under -- like Rule 26 would provide.

So for those, that's updated with regard to the defendants, anybody acting on behalf of the Wayfarer defendants, but that's sort of what came up at the last hearing was there's a question that's still, I guess,

outstanding as to crew members.

Are the communications with crew members responsive to the subpoena such that they need to be culled, Bates numbered and logged as privileged or are they not responsive to the subpoena?

Our position was that they weren't responsive because these aren't employees acting on behalf of Wayfarer. They're just simply people that were crew on the film, independent contractors for that time period.

I guess that -- and I know your Honor stated at the last hearing at least definitively with regard to if a message was sent out and there was no resummons or no comment or something like that or an NDA, that those didn't even need to -- that those could be excluded.

THE COURT: That's right.

MR. MITCHELL: So to answer the question, if the crew members that responded with something substantive -- I think those were the words you used last time -- are to be culled and Bates numbered and logged, we would simply have to -- to do that.

We've already -- we've reviewed the -- the hits that have come back and essentially a lot of this can be eliminated. I'll give you an example. In the Gmail, you see, like the term Blake, there's 556 hits. Most of those can be easily excluded when we review that data because

of the fact that a lot of these are a court listener, fan emails or, for instance, on Mr. Signore's YouTube page, he has automatic alerts. So every time a video comes out or a headline by some other creator or media person comes out, those will come in. So you can see those and those are large chunks of the hits. We can exclude those.

THE COURT: Okay.

MR. MITCHELL: So really, it just comes down to, you know, digging that down to -- you know, narrowing down to who these crew members are that -- that -- if they are responsive, that would fit in here. And I think we pretty well know the extent of how many of those there are.

The -- the -- I guess the difficulty or the only remaining work that would be necessary would be to actually -- and this is extensive. I mean, it's -- it's a substantial amount of work to go through and gather every one of those communications, convert it to a document, a PDA, Bates number it and log it.

So I'm not saying that there's 30 hours or 40 more hours of work to do, but it's not something that can be done in two hours.

THE COURT: Understood.

MR. MITCHELL: And I think Mr. Signore, since he's the one that is primarily running the searches, I'm

overseeing and I understand the process that's being -- that's being done and providing guidance there, but given that these are his repositories and he's the one that made the outreach communications and he knows who we're dealing with, I think he could probably provide more detailed of an answer, your Honor, if you -- if you were so inclined to hear that.

THE COURT: Okay. Well, maybe in just a moment. Thank you for that, Mr. Mitchell.

I -- I think in terms of responsiveness to the request -- I might ask Ms. Governski -- but I think that what I would probably -- if the parties haven't already conferred about that issue, it sounds like there was a conference about -- again, that be talked about last week about these particular outreach emails where there was no substantive response, but I -- I think to the extent there's a question about whether other particular emails are responsive, my first inclination would be to have the parties confer about that.

But, Ms. Governski, we're all here today. You've heard what Mr. Mitchell has said. Is it your view that those type of communications are responsive to the subpoena?

MS. GOVERNSKI: So I'm sorry. It was -- it was a little hard for me to follow that, but if the answer is

substantive responses from crew members, then, yes, those would be responsive because especially if the content is like reaching out on behalf of Justin or I talked to Justin today. I mean, those -- like, it seems like you have to review them in order to determine whether they were sent on their behalf or not and arguably, if Mr. Signore is receiving information from other sources, that also is relevant and responsive. So I -- I would think that those are responsive if they are substantive.

But I -- I just want to also, if I can just take a quick moment to address the converting to PDFs, like, I don't know that that is necessary. I mean, we have a -- in the underlying case, we have an ESI stipulation that I'm happy to provide about the format of this.

And oftentimes in production what is produced are not PDFs, rather like Native format. So we're welcome -- we're happy to, like, work with you on that as opposed to having to convert them to PDFs.

But I was a little bit confused about the answer about, like, whether in the 643 chat threads and the 9,684 lifetime emails, I have two questions. First, have they been -- have those been deduped or is it possible that if it hits on Lively and it hits on Baldoni, it's a false inflation of the total number because they're really the same document? So has that been deduped?

And then the second is I'm a little confused by both Mr. Mitchell saying that this exists in raw format and that all of these have been reviewed. So have all of the 64 chat threads and all of those emails been reviewed or is that pending converting them to a readable format, which by the way doesn't have to be PDF? There's, like, other formats that you can use to convert them in a -- in a less time-consuming manner.

So those are my questions.

MR. MITCHELL: I can answer those questions, your Honor.

THE COURT: I'm sorry?

MR. MITCHELL: I can answer those questions if --

THE COURT: Yes, please. Go ahead.

MR. MITCHELL: Okay. Sure. As far as the converting to PDF issue, or Native format, to the extent that some of these things exist in Native format or that we have them in Native format, with the limited tools that we have, given that we're not -- you know, what eDiscovery vendors have, for instance, the HTML exports for WhatsApp, that's a format that wouldn't necessarily have to be converted into an PDF. It's -- it's a format that can be saved as a file and -- and sent.

Gmail, on the other hand, and some of these others -- in fact, I would say at this point it's the

majority of the databases or repositories that we're talking about here, we -- they're only in web form. We don't have an exported version of that universe of data.

So I -- I don't know how -- what Native format a Gmail email could be provided in given that we're looking at it in a search window and -- and we're getting line item hits on -- on a -- in a web page. We have to, you know, go through and print every one of those things off a PDF to -- to make those work.

So, yes -- yes and no. To some extent, some of these things could be converted -- could be provided in Native format without converting. For a lot of the others, I don't know any way to do that. I think it would have to be converted to PDF. That's the one thing.

MS. GOVERNSKI: Can I just quickly --

THE COURT: Okay.

MS. GOVERNSKI: -- address that one point just --

MR. MITCHELL: Sure.

THE COURT: Sure.

MS. GOVERNSKI: We're more than hap- -- I'm more than happy to confer with you on this and also have our vendor talk about ways to remove any burden, like, including maybe dragging it to a flash drive and sending it to them to convert. I think that there's ways around that. Once

you've determined that these are responsive, I think we can work together on that.

MR. MITCHELL: Yeah. I'm happy to talk to you about it, yeah. I just don't -- I don't know how to put Gmail on a flash drive either. So, yeah, I mean, if -- if you know a way to do that, then I'm all ears.

MS. GOVERNSKI: No, our ven- -- I'm sure my vendor does, yeah.

THE COURT: Yeah. That sounds like a good -- that sound like a good conversation for you all to have after -- after our hearing today, that -- to make -- if -- if there's a way to facilitate that.

Mr. Mitchell, go ahead. You were going onto the next point.

MR. MITCHELL: Okay. Sure. Thank you, your Honor.

As far as whether there's an overlap -- in other words, whether all of these hits are mutually exclusive of the others, the answer to that is no. For instance, the -- the -- for the Gmail, blink, we had 556 hits. Lively, 512 hits. A lot of those would overlap. In other words, the same email would give us a hit on both of those searches, but every time we have to run one of those search terms, we're going to get a list of emails and we're going to have to look at all of those emails. We don't know which ones

pinged in -- in response to another search.

In other words, we can't -- we can't eliminate all of those emails and say, okay, don't send us those hits back when we run the next search term.

Does that makes sense?

So it just -- you know, to some extent while there is overlap and, you know, to the extent that we can remember as we're reviewing those hits that, okay, you're right, I know that whole group of stuff came back from countless interviews, scroll past that, but still it does require looking at it unfortunately.

And then for the last question, have all of these hits been reviewed or are we still waiting for them to be readable and in some readable format? No, they're all readable. We can read all of them.

In fact -- oh, provide a little more color for the Court on the extracted data for the -- for the sets that we have where we do have HTML extracts, in Windows File Explorer, using the Windows search just like you would look on your computer and -- and see any other file up in the top right corner there, you can run a search of a term, what comes back in that file retrieve is you're going to get a bunch of hits of HTML documents.

But when you click on each one of those, it provides a preview just like Gmail does when you get your

responses back in a Gmail search, it shows a small preview of -- of the surrounding text around the highlighted -- the term, the hit. So you're able to ascertain much of the substance of -- of what that communication is about.

And oftentimes, just, as I said, with the courtless interview, even for -- for HTML, we wouldn't have a subject -- email subject. They're so -- all we have is an HTML. It would be HTML 1, HTML 2, HTML 3. That wouldn't provide us any insight as to what's going on or who it's from.

But in that preview for HTML files, it does provide us that. So in the same way that we're able to eliminate large chunks of the Gmails as unresponsive, we can do the similar thing using the preview in the File Explorer. So, yes, they've all been reviewed to determine what's responsive. This --

THE COURT: Well, and I think --

MR. MITCHELL: -- is simply all of the hits that came back. That's all.

THE COURT: Yeah. No, and it's helpful. I -- I appreciate you filing it. I guess one -- one area where you might be able to cut down on some of this and -- and I don't -- I don't want to invite Mr. Signore to speak unless counsel wants him to, but -- and I certainly don't want you

to reveal anything either, but to a certain extent, the -- I don't know how many people were communicated with, but to a certain extent understanding who was contacted or who was providing information might cut down somewhat on the review because, like you said, there are going to be emails that Mr. Signore was receiving that have nothing to do -- I mean, they have nothing to do with what Ms. Governski and her client are seeking such as reports from other media outlets or other court databases or what have you.

MR. MITCHELL: Sure.

THE COURT: So that -- that may -- that may help.

MR. MITCHELL: Your Honor, I --

THE COURT: Go ahead, Mr. Mitchell.

MR. MITCHELL: I forgot to mention one thing or respond to one thing that Ms. Governski said, the first thing she mentioned when we were talking about whether some of these crew member communications are responsive, something that she -- she mentioned, I think that actually helps a lot where she proposed a hypothetical where a crew member stated I'm contacting you on behalf of Justin Baldoni, if we're using that as a modifier to identify a responsive -- what's responsive and what's not, that, I would say, certainly does fall within the -- the parameters of the subpoena because it's asking -- it's

essentially someone communicating on behalf -- stating he's communicating on behalf of a Wayfarer party.

If we're only including those crew members that are stating that they're communicating on behalf of a Wayfarer party, rather than every crew member that Mr. Signore talked to, even if he was only talking to them about the temperature on the set, you know, while he was, you know, hanging lights or something like that, that would definitely narrow down the -- the remaining work to do. So I mean --

THE COURT: Well --

MR. MITCHELL: -- if there's anyway we can, you know, come up with a -- come up with a definition that could help us differentiate between those.

THE COURT: Ms. Governski, I think Mr. Mitchell has a point. I mean, the -- the theory of -- of relevance here is that there's a claim that these defendants were engaged in an organized campaign to defame or, you know, otherwise turn the, you know, the media or public sentiment against her based on her claims of sexual harassment.

And so is it not fair to say that in this search, we should have some involvement of the defendants or somebody acting on behalf of the defendants, as you said, rather than just Mr. Signore searching for every comment he received from people that maybe he had -- where he initiated the

outreach and it didn't have anything to do with, you know, the defendants?

MS. GOVERNSKI: I actually think that the way that you just framed it, your Honor, is -- is the right way. I mean, we could do that if it is not in response to Mr. Signore's solicitation, but it is a crew member contacting him on their own. I would say that is a line to draw.

I think it's going to be pretty hard for me to agree that the email has to expressly say, like, on behalf of Justin because I don't -- you know, there -- we're -- we're in the midst of summary judgment briefing and going through the evidence to determine who was acting on their behalf, right? And so it's a little hard to say, sure, just exclude anyone who you don't know was acting on their behalf or who is mentioned in the email as acting on their behalf as opposed to, like, hmmm, this crew member just emailed me out of the blue giving me dirt on Blake Lively.

I would say that email would be responsive, but if it's in response to something Mr. Signore reached out to relating to his documentary, for instance, I would feel comfortable drawing the line there. But I think it's hard to draw the line, like, for other things -- in another way.

THE COURT: Okay. So does that --

MR. GORDON: (Inaudible interruption.)
THE COURT: -- does that make sense, Mr. Mitchell and Mr. Gordon? I think --
MR. GORDON: No, no, no --
THE COURT: -- what Ms. Governski has said --
MR. GORDON: -- (inaudible interruption.) Respectfully, no, it doesn't, your Honor. These -- it expands the scope of the subpoena. The spoken specifically references Wayfarer defendants or their counsel or agents acting on their behalves.
THE COURT: Well --
MR. GORDON: Again, my --
THE COURT: Okay. Well let's -- let's go -- let's get a little more specific then if we're looking at the actual requests.
So Request No. 1 is for documents and communications provided to you by any of the Wayfarer defendants or their counsel. Okay. So we've got that.
Any agreements -- any agreements you have --
MR. GORDON: There are no agreements with --
THE COURT: Okay. All right. I understand.
MR. GORDON: -- with Production No. 2.
THE COURT: Let me --
MR. GORDON: Go ahead.
THE COURT: Yeah, let me just...

So Request No. 5 does appear to be a little broader than the earlier ones in that it is seeking documents and communications concerning a bunch of things related to the case and -- and Ms. Lively and others.

MR. GORDON: I -- I would -- I -- I would --

THE COURT: Hold on one second.

MR. GORDON: Yes, your Honor.

THE COURT: And that were made in connection with or on behalf of the Wayfarer defendants or their counsel. This request includes circumstances in which any Wayfarer defendant or their counsel or anyone acting on their behalf provided you with a statement, a script, talking points or any information.

So I think that -- does that get to what you're talking about, Ms. Governski?

MS. GOVERNSKI: That, and No. 4, your Honor.

I mean, No. 4 says all documents and communications regarding your digital online content to creator or influencer services or strategies concerning the consolidated action in connection with or on behalf of.

So, you know, any documents or communications about, hey, publish this about Ms. Lively today would be, I think, responsive to 4 and 5. In other words, we were not intending by our request for Mr. Signore to be making

a legal determination about who was an agent or acting on the behalf of the Wayfarer defendants. That would -- you know, we were seeking communications -- incoming communications that he received pitching stories about Ms. Lively.

And so -- so that's really what we're -- what we're getting at here. And so for us to try to draw a distinction and have Mr. Gordon or Mr. Mitchell or Mr. Signore decide, well, this one was on their behalf, but this one wasn't doesn't really feel like something they're even in a position to determine at this point.

THE COURT: Well, I just want to back up a little bit --

MR. GORDON: I think --

THE COURT: -- because, Mr. -- Mr. Gordon, I do think -- I want to go back to what we were talking about just a moment ago. I do think that what -- between Mr. Mitchell and myself and Ms. Governski talking about eliminating the category of communications in which Mr. Signore is reaching -- affirmatively reaching out to people and getting responses back, that -- that seems to be -- to me to be the -- a giant category of information --

MR. GORDON: It's huge.

THE COURT: -- that we can -- that if -- if --

if we're in agreement on eliminating that, I think that --

MR. GORDON: Right.

THE COURT: -- does save quite a bit -- quite a bit of time here.

But I think what Ms. Governski is saying if you -- and I think it seems to fit and I'll let you, Mr. -- I'll let you jump in here in just a minute.

MR. GORDON: Sorry.

THE COURT: Just give me a --

MR. GORDON: Sorry.

THE COURT: Let me finish the thought.

If -- if Ms. Governski is saying let's put -- let's just search -- instead let's look for the things that were coming in, you know, un- -- I guess unprompted by Mr. Signore that were feeding information and let's not have you deciding whether they were acting on behalf of the defendants or their counsel, because you may not know that, but if it's coming in and it fits this request, then I think that -- I think that -- hopefully, that could be a much smaller universe of --

MR. GORDON: Right.

THE COURT: -- of information to look through and --

MR. GORDON: Right.

THE COURT: -- a much easier list.

But, Mr. Mitchell, go ahead.

MR. MITCHELL: I -- I mean, I think that actually makes sense and it -- you know, it kind of -- this actually kind of reminds me of, you know, how do we draw a distinction like this? What is it -- how do we define this?

It reminds me of -- was it Justice Scalia (sic) said I don't know the definition of pornography, but I know it when I see it, right? You know, how do we define what's on behalf of?

If we can eliminate the communications where Mr. Signore made the outreach to the crew member, that would, I believe, make things a lot easier such that we're limiting this to communications where a crew member reached out to Mr. Signore unprompted. And I think that -- I would say that's a fair compromise under the circumstances.

THE COURT: And you -- just to be clear, you think that you have covered in your search and review everything that would have come directly from the defendants and their counsel, is that right?

MR. MITCHELL: Yes.

THE COURT: Okay.

MR. MITCHELL: That's correct.

THE COURT: All right. Okay. Mr. Gordon,

I think Mr. Mitchell wrapped it up there, but did you want to add anything else?

MR. GORDON: Other than to vent, I probably shouldn't, Judge, because --

THE COURT: Okay. I was going to say --

MR. GORDON: I -- I -- I -- I keep going back to Rule 45 in terms of trying to avoid the undue burden and -- and I -- I appreciate the compromise. I just still think it's super expansive and it's just incredibly burdensome to Mr. Signore and to my office. That's the concern.

THE COURT: Well, yeah. Well, I -- I understand that, sir, but I guess I'll go back to the -- sort of the original hearing we had a few weeks ago where, you know, I invited -- I invited you to tell me what -- whether there was issues with the scope -- if there were issues with the scope of these requests and that's certainly something that -- apologies -- that's something that --

MR. GORDON: Well, now, that -- that --

THE COURT: -- that --

MR. GORDON: That's on me and I must have interpreted the manner in which I read these subpoenas --

THE COURT: Well, but I think that --

MR. GORDON: -- when I read these subpoena requests.

THE COURT: Ultimately -- ultimately, Mr. Gordon, we are getting -- even though at that hearing a few weeks ago there was no issue raised with the scope of the request, the thing Ms. Governski is offering narrowing compromises here that I think are helpful.

So -- so I think we're getting around to that and I understand, look, I'm -- Mr. Signore is not a party to this case and, you know, so the -- the burden analysis is -- is different for him.

Although I will say -- and I know that your motion did raise an issue of burden with respect to the privilege -- producing of privileged materials because the -- Mr. Signore believes that Ms. Lively should be getting these from the defendants. So that's something that I am -- I am looking at.

But in terms of the scope of the request, I think we've already -- we've already -- that ship has sailed, but yet we are still discussing compromises. So I think, you know -- I think -- I think what's been proposed by Ms. Governski and reiterated by Mr. Mitchell makes sense that we should lay our focus there on the remaining search and review.

MR. MITCHELL: Can I add, your Honor, that I'm sorry. Go ahead. I'm sorry.

THE COURT: No, no. Go ahead.

MR. MITCHELL: Regarding, you know, the -- the burden analysis, I know that's not before the Court right now, it's probably best suited to raise this, you know, at a subsequent hearing when the time is right after the work is complete here, but, you know, the -- as far as Rule 45 burden authority is concerned, there -- there's no necessary element of malice that's required to find undue burden with regard to a Rule 45 subpoena, you know, for purposes of compensating costs and whatnot.

And I know that again it's not before the Court right now, but, you know, still even if -- if -- with compromises and responding, you know, to subpoena requests that aren't necessarily overly broad or expansive, burden can still become, you know, an issue that -- that requires a Court's attention at -- you know, as far as again for compensating time and expenses and whatnot. So we'll bring that up at a later time.

THE COURT: Okay. Yes, Ms. Governski?

MS. GOVERNSKI: Well, I -- well, I mean, I would think the time -- the time has passed to bring up shifting of fees. So we would object to that.

And also we tried to confer on this before you filed a motion to quash. We tried to try to resolve this. I think a lot of where we are now and how inefficient it has been is that you rushed to file a motion to quash and

then didn't do the proper collection and search.

So, I mean, I -- I -- I am sympathetic, of course, to Mr. Signore being a third party, but I also think a lot of this inefficiency was caused by kind of consistently not just doing it the right way the first time.

I also would note looking even at this hit report, they repeatedly said how narrow the terms were. If you look at the terms, they're all very narrow. There is no suggestion that the terms were hitting on false hits. Even the ones that Mr. Mitchell was saying are not responsive were because they were other articles that were about our client.

MR. MITCHELL: That was just an example.

MS. GOVERNSKI: Okay. Well, I don't think 643 chat threads feels particularly onerous to produce and it's hard for me to understand if they're individual chats or full threads. It's hard to know, but with the number of hits, it seems -- I actually don't know the answer to that.

And then 10,000 emails that likely are multiple ones of the same version, again it just doesn't feel to me like that is a really huge undue burden. The burden comes from their inability to dedupe or their -- you know, I think that there's probably ways to make it more efficient.

THE COURT: Well, I --

MR. MITCHELL: (Inaudible response.)

THE COURT: -- you know, I -- I -- I guess, let's -- and let's -- I definitely agree that there could have been a lot more time spent by counsel on this before we got into this process, but we are working through it now and so -- and I think we're going to get -- we're going to end up in the right place with this, but if there -- in terms of the -- in terms of the burden, I will -- I will just say that, yes, it does not seem like a tremendous amount of information, but the complicating factor here is that Mr. Signore has raised in his motion to quash a claim that all of this information is privileged and the -- the reason why this is becoming so cumbersome is because in order to make a claim of privilege, you have to do it specifically and it has to be document-by-document.

And that's why we go through this. It's because there's -- there's so much in here that could be responsive and not privileged. But because we are now requiring -- because there's a claim of -- of -- of privilege as to all of this information, that is why -- you know, and it's -- it's Mr. Signore's right to assert the privilege, but he has to substantiate it and that's why we're kind of in this struggle that we're in right now.

So -- but we're going to push through. So

here's -- here's what -- here's what I'm going to do. Again, Mr. Mitchell and Mr. Gordon, we need to have the attachments to that text message chain pulled and sent to that -- as part of the in camera review. If you could, do that electronically or in -- or in hardcopy, but I'll just enter an endorsed order on that.

MR. GORDON: Yes, your Honor.

MR. MITCHELL: Your Honor --

THE COURT: Yes.

MR. MITCHELL: -- one thing on that.

THE COURT: Yes.

MR. MITCHELL: I don't want to speak out of turn on the availability. I -- I know what you're referring to.

THE COURT: Yes.

MR. MITCHELL: And -- and I -- I assumed that what you're seeing there is a function of the software tool used to extract that text message thread that doesn't -- but let me just add with the caveat that I don't know that in the Native format and the actual SMS format on the phone, the device itself, that those attachments are even available. To the extent they are available, absolutely.

THE COURT: Okay.

MR. MITCHELL: I just wanted to add the note that it's -- it is a possibility that some of those things

are showing up that way because they aren't actually on the device anymore.

THE COURT: Okay. Understood, understood. Thank you.

Okay. And then -- let's see here. So we're going to do that. Mr. Signore still has -- there's still time on the extension to produce the final privilege log.

Oh, I was going to ask Ms. Governski because we've -- it's been a while since we -- we spoke on this topic and -- but have -- in terms of the analysis of overcoming the privilege, I just want to revisit and ask if there -- there are communications that the defendants have produced with Popcorned Planet or Mr. Signore?

Have you been able to obtain any of those through your discovery? I understand you file a motion to compel and a spoliation motion. I just wanted to see -- the Southern District New York docket is very big.

MS. GOVERNSKI: And I understand.

THE COURT: You know it better than I do.

MS. GOVERNSKI: Yes, yes, your Honor.

We have received some, including, as I think I mentioned at the original hearing, one communication with a defendant in December of 2024 and then text chains with Ms. Nathan.

So I think that some of the items on the

privilege log between Mr. Signore and Ms. Nathan, we have received.

THE COURT: Okay.

MS. GOVERNSKI: But only up to February, right? I mean, we haven't received prior later ones.

THE COURT: Okay.

MS. GOVERNSKI: So we haven't -- and it seems like what Mr. Signore is -- has -- how he has described on his privilege log and I think here, which are texts with Melissa Nathan, those -- he certainly seems to have more.

So, you know, part of this also is we have filed a motion for spoliation, including relating to Signal communications, but also a lot of the ways we've been able to figure out that the defendants have not been fully transparent with us is by receiving third-party discovery where the chains are different or the -- or not different but, like, certain materials redacted in their chain and not in the produced chain and we find out these materials actually shouldn't have been redacted.

So there is a separate relevance with respect to getting the communications from both sides as opposed to just from Ms. Nathan and it does seem like Mr. Signore has more communications than what we have received from Ms. Nathan.

I would also suggest that while I understand

Mr. Signore's point about privilege and I very much value a reporter's privilege being a former reporter, I -- I think we -- it's not a secret that Ms. Nathan is a source. I mean, his privilege log admits that Ms. Nathan is a source and she's produced documents with him.

So it just feels to me like one way to potentially cut through this is go ahead and produce the communications with Ms. Nathan, which are responsive and, you know, let the parties confer and see whether that's sufficient.

So I -- I just think that there are ways that the parties could maybe try to seek to resolve this outside of the privilege, but again it felt like there was an immediate rush to try to protect absolutely everything as opposed to seeing if we could find some middle ground.

THE COURT: Well, I would invite the parties to have that conversation as well as to have the conversation that you mentioned earlier about any sort of strategies you have, Ms. Governski, that you could offer Mr. Mitchell and -- and Mr. Gordon and their team for facilitating sort of the extraction or -- of these -- of these documents without having to convert them to PDF.

But I would also invite the parties to consider whether that is something that you can do to resolve this matter.

MR. GORDON: And I apologize, Judge. I just

need some clarification.

THE COURT: Yes.

MR. GORDON: Because -- and I mean this respectfully, but it sounds almost like you're asking us to discuss waiving the journalistic privilege.

THE COURT: Well, I don't know what Ms. Governski has in mind. I'm -- I'm not suggesting that you should or have to do that, but she's suggesting there may be a compromise to be -- to be had here and I just suggest that you have a conversation outside of this hearing about whether that's possible.

MR. GORDON: Yes, your Honor.

THE COURT: I'm -- I'm not suggesting that Mr. Signore should waive any privilege that he has, but, you know, to the extent that he wishes to do that because something has already been produced by a defendant in the case, that -- that may -- that's something you can counsel him on.

All I'm saying is it would, you know, certainly be a good -- a good thing to have those discussions and see where you can get with it and have the discussion about what methods might be available to expedite or facilitate what you're doing and -- so -- so I would just encourage the parties to do that.

And again, to the extent that you can get the

attachments to the text message chain that's in the privilege log, Item No. 4, I'll direct you to do that.

And then I'll also, based on our conversation today, my understanding is there is an agreement that we're going to just focus the search on communications that affirmatively came in from crew members that, you know, were not in response to an outreach from Mr. Signore.

Mr. Mitchell, yes?

MR. MITCHELL: I was going to -- I'm glad you mentioned that. I wanted to ask you when we do file the final privilege log next week --

THE COURT: Yes.

MR. MITCHELL: -- that would encompass any of these additional -- within the parameters of what the Court has just ruled, are we providing an updated in camera binder with those materials or are we waiting until we discuss it further?

THE COURT: Why don't you -- you -- why don't you hold off on that.

MR. MITCHELL: Okay.

THE COURT: I will take a look at those. I'll take a look at what's filed next week and then, you know, in the meantime, counsel should have a conversation about some of the things we've discussed today.

And then I think once I have a chance to look at

that and look at this a little further, I'll probably set another status. I know we're kind of going into the holiday. So if -- it may be that the next time we -- we can meet will be after that, but we'll -- I'll -- I'll confer with you all before I set anything.

MR. GORDON: Very good.

THE COURT: Okay.

MR. MITCHELL: Thank you, your Honor.

THE COURT: All right.

MS. GOVERNSKI: Thank you so much, your Honor.

THE COURT: I think that -- yeah absolutely. I think that covers everything for today.

Thank you all for being present and for your contributions and we will be adjourned.

MR. GORDON: Thank you, your Honor.

(Whereupon, the Court adjourned at 3:44 p.m.)

--oo0oo--

UNITED STATES DISTRICT COURT )
)
MIDDLE DISTRICT OF FLORIDA )

REPORTER TRANSCRIPT CERTIFICATE

I, LORI ANN CECIL VOLLMER, Official Court Reporter for the United States District Court, Middle District of Florida, certify pursuant to Section 753, Title 28, United States Code, that the foregoing transcript is a true and correct transcription of the stenographic notes taken by the undersigned in the above-entitled matter, Pages 1 through 40, and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States of America. I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys to this action, nor financially interested in this action.

IN WITNESS WHEREOF, I have set my hand at Tampa, Florida, this 18th day of January 2026.

/s/ Lori Ann Cecil Vollmer

Lori Ann Cecil Vollmer, CSR, RPR
United States Court Reporter