# EXHIBIT 5

1          IN THE UNITED STATES DISTRICT COURT

2             MIDDLE DISTRICT OF FLORIDA

3                  TAMPA DIVISION

4

5   POPCORNED PLANET, INC.,              )
                                         )
6          Movant,                       )
                                         )  Civil Docket
7       vs                               )
                                         )  No. 8:25-mc-28-WFJ-LSG
8   BLAKE LIVELY,                        )
                                         )
9          Respondent.                   )
    _____ )

10

11                 **STATUS CONFERENCE HEARING**

12

13                   Heard in Courtroom 9B
         Sam M. Gibbons United States Courthouse
14              801 North Florida Avenue
                  Tampa, Florida 33602
15           Thursday - November 13, 2025
               3:00 p.m. - 3:44 p.m.
16

17        BEFORE THE HONORABLE LINDSAY SAXE GRIFFIN

18            UNITED STATES MAGISTRATE JUDGE

19

                 LORI ANN CECIL VOLLMER, CSR, RPR
20               Federal Official Court Reporter
         Sam M. Gibbons United States Courthouse
21           801 North Florida Avenue, Room 1221
                  Tampa, Florida 33602
22          Lori_CecilVollmer@flmd.uscourts.gov
                     (813) 301-5336
23

     Proceedings transcribed via courtroom digital audio recording
24    by a court reporter using computer-assisted transcription.

25

                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                         TAMPA DIVISION

1                          APPEARANCES

2
    PRESENT ON BEHALF OF THE MOVANT,
3   POPCORNED PLANET, INC.:

4          MR. JEFFREY LEE GORDON and
           MR. DAVID P. MITCHELL,
5          MANEY & GORDON, PA
           101 East Kennedy Boulevard
6          Suite 3170
           Tampa, Florida 33602-5151
7          (813) 221-1366
           j.gordon@maneygordon.com
8          d.mitchell@maneygordon.com

9

10  PRESENT ON BEHALF OF THE RESPONDENT,
    BLAKE LIVELY:
11
           MS. MERYL CONANT GOVERNSKI,
12         DUNN ISAACSON RHEE LLP
           401 Ninth Street, N.W.
13         Suite 800
           Washington, DC 20004
14         (202) 240-2900
           mgovernski@dirllp.com
15

16

17

18

19
    ALSO PRESENT:
20
    Mr. Andy Signore
21

22

23

24

25
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                          TAMPA DIVISION

1                      PROCEEDINGS

2   (Open court.)

3   (Court called to order.)

4              COURTROOM DEPUTY:  Good afternoon.

5              This Court calls *Case No. 8:25-mc-28-WFJ-LSG,*

6   *Popcorned Planet, Incorporated versus Lively*.

7              THE COURT:  All right.  Good afternoon,

8   everybody.

9              I'll hear appearances from counsel, please.

10             MR. GORDON:  Good afternoon, Judge.

11             Jack Gordon and my law partner Dave Mitchell on

12  behalf of Popcorned Planet.  Mr. Signore is also here with

13  us at the hearing today.

14             THE COURT:  Great.  Thank you, all.

15             MS. GOVERNSKI:  Good afternoon, your Honor.

16             Meryl Governski on behalf of Ms. Lively.

17             THE COURT:  Thank you, Ms. Governski.

18             All right.  So we're here just for a brief

19  status.  I have a couple of questions and things to raise

20  and then I'll -- I'll let the parties raise anything they

21  wish to.

22             So, Mr. Gordon, on the -- thank you for providing

23  the -- the documents for in camera review.

24             I did note that one of the documents has --

25  appears to have several attachments, No. 4 in the privilege

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

1   log at 25-1.  Those -- those attachments will need to

2   be -- I'll need to look at those as well and they'll

3   need to be logged if they're considered privileged as --

4   as well.  I don't -- again, I think there's several of

5   them.  It's a very long text chain, but those attachments

6   will need to be separately provided.

7           MR. GORDON:  Yes, your Honor.

8           THE COURT:  Okay.  All right.  So the next thing

9   I wanted to ask about was the hit report that was produced.

10  Thank you for providing that information.

11          And I don't know if Mr. Gordon or Mr. Mitchell,

12  you wanted to speak to this, but I'm going to refer to

13  31-1, which is the amended exhibit that was provided.  I

14  wanted to just ask if you could give me a little bit of

15  direction here just in terms of it looks like there are

16  many hits in some of these categories and then there's

17  kind of some comments at the top.

18          I guess just this gets to the question I asked

19  at the last status conference.  What's the -- what's the

20  size or scope of the documents you're reviewing.  I see

21  again, like, it looks like there's -- if you look at the

22  total hits, there's -- and you add those all up, there's

23  probably over 10,000 hits, but what's -- what's the number

24  of documents that you're reviewing or that you've --

25  you've collected that you're still reviewing?  That's --

1            MR. GORDON:  Those -- those -- those -- and

2    I promise the Court the last thing I want to do is whine

3    or vent, but it's going to sound like it.

4            I can attest to the number of hours -- and --

5    and I think the Court already fully appreciates the fact

6    that I don't have any technological skill whatsoever,

7    right?  So Mr. Mitchell has been spending just an inordinate

8    number of hours over the course of the past couple of weeks

9    as well with Mr. Signore.

10            It's just incredibly burdensome.  And again, I

11   apologize because I don't want to -- if it comes out of

12   my mouth, it's going to sound like C-3PO and R2-D2, but --

13   but Mr. Mitchell should be able to explain specifically

14   the programs utilized and the nature and scope of just how

15   much stuff we've gone through.

16            THE COURT:  Okay.  Yeah.  I just want to know

17   how much -- how much you have, what you've gone through,

18   what remains to be done and if you can put that into some

19   sort of specific numbers, that would be super helpful.

20   And again, this hit report is helpful.  I just wanted to

21   put that in context.

22            So Mr. Mitchell?

23            MR. MITCHELL:  Yes, your Honor.

24            I guess if you're question is what is still

25   left to cull from these search results, these hits that

1    were run on each of these search terms and each of the

2    repositories --

3            THE COURT:  Well, let's -- let me --  I'm sorry

4    to interrupt you.  Let -- let me back up.

5            MR. MITCHELL:  Sure.

6            THE COURT:  In terms of these hits, how --

7    what's the size of -- of the -- of the documents?  Like,

8    what's the size of the information just with the hits

9    alone?

10           Like, what did -- what are the -- do you have

11   a number documents?  Do you have a file size?  Like,

12   what --

13           MR. MITCHELL:  They're not in document form yet,

14   your Honor --

15           THE COURT:  Okay.

16           MR. MITCHELL: -- since they're still in negative

17   raw format.  Either -- whether it would be, you know, for

18   instance Gmail --

19           THE COURT:  Okay.

20           MR. MITCHELL: -- and I know -- let me -- I don't

21   want to get ahead of myself here, but I'll -- I'll tell you

22   from having discussed with eDiscovery vendors that we spoke

23   to, which we did provide some quotes there --

24           THE COURT:  Yes.

25           MR. MITCHELL: -- I have a greater understanding

1  for how the eDiscovery process works through the third-party

2  vendors.  We don't have the tools that are available to

3  them for searching some of this information.

4        So, for instance, Gmail, I was -- it was described

5  to me the following way; a request is made for the raw data,

6  even though it's web mail, Google will provide a bucket,

7  they call it, that would, for instance, cover a certain time

8  period.  Then that's hosted and -- in a eDiscovery platform

9  like Google Vault and that's when the search terms are run

10  against it.

11       It's much like an SQL search is run on a -- you

12  know, SQL queries are run on a normal database.  Since we

13  don't have access to that, the search that was done for

14  Google was simply running the search using the native search

15  function in the top of the Gmail window.

16       THE COURT:  Okay.

17       MR. MITCHELL:  And then as you can see, if you

18  ever run a search in Gmail, you'll see, you know, line

19  items that come back as responsive to that.  So those are

20  in document format.

21       As far as some of the others where, for instance,

22  Meta does allow you to request your data in HTML or -- or

23  Java format, they're notoriously slow, as I understand it,

24  at responding to that.  So we do have some of that and some

25  of that's been searched.  So it's in HTML format.  Again,

1  not in document format, but, you know, it's -- it's a

2  format that could easily be converted to documents.

3  some of it, we don't have.  Some, we had to use again

4  the Native search functions, much like Gmail, and in

5  which case we're only seeing in the web interface.

6              THE COURT:  Okay.

7              MR. MITCHELL:  So I don't know if that answers

8  your question, but it's not in document format yet.  It's

9  still, you know, Native, either web-based or in HTML or

10 Java format.

11             THE COURT:  Okay.  So you've -- you've run the

12 searchs, but not necessarily col- -- I guess collected

13 all of it and put it in one spot where you can --

14             MR. MITCHELL:  Right.

15             THE COURT:  -- search through it?  Yeah.

16             MR. MITCHELL:  Exactly.

17             THE COURT:  Okay.

18             MR. MITCHELL:  I mean, to turn all of that into

19 actual PDFs, as you can see from the numbers of hits that

20 came back from some of these, they're in the thousands,

21 like you said, we'd be dealing with a pretty massive PDF

22 file, I think.  So no, it hasn't been converted to that

23 yet.

24             THE COURT:  Okay.  And these notes that you

25 have --

1           MR. MITCHELL:  Only the ones that -- only the

2  ones that we've provided to the Court in -- in the in

3  camera binder, those were converted to --

4           THE COURT:  Okay.

5           MR. MITCHELL:  -- to PDF.

6           THE COURT:  Okay.  Understood.

7           And the notes that are along the top of this

8  Page 3 of Document 31-1, those sort of explain what --

9  what you were -- a little bit about what you were saying

10  to me --

11           MR. MITCHELL:  Right.

12           THE COURT:  -- just a moment ago of how the

13  search --

14           MR. MITCHELL:  Exactly.

15           THE COURT:  -- was done and what -- what you

16  turned up.

17           MR. MITCHELL:  Correct.

18           THE COURT:  It's like the current status, I guess?

19           MR. MITCHELL:  Right, exactly.

20           As it says in -- for -- for some of those, like,

21  the WhatsApp, it shows that we're -- we're waiting on the

22  request that Meta HTML export.  Some of them, they're, I

23  guess, within the Meta universe like Facebook.  I believe

24  we do have those.  But -- but it's all here.  It's all

25  described, what we have and what we're waiting for.  And

 1  for those that we don't have the actual raw data extracts

 2  for, we just did the manual search using the web interface.

 3          THE COURT:  Okay.  And can you -- I guess with

 4  reference to these particular categories, what -- what

 5  remains to be reviewed?

 6          It looks like, for identification, you've got

 7  in the first three or four columns -- it looks like you've

 8  got either exports or other searches that have been done.

 9  How -- how much of that remains to be sort of reviewed and

10  looked through by counsel?

11          MR. MITCHELL:  Well, the -- the -- the term- --

12  the repositories have all been searched and indexed by hit.

13  So that's all here.  I mean, there aren't any more hits

14  that are going to come back from these search terms on

15  any -- you know, for instance, on the right side of the

16  document where you'll see a Discord Popcorned Planet,

17  there's a bunch of zeros, that's not because it hasn't

18  been searched, it's because none of the search terms

19  resulted in a hit for that term.

20          THE COURT:  Oh, I understood.  I guess just the

21  hits --

22          MR. MITCHELL:  Correct.

23          THE COURT --  aren't necessarily responsive

24  documents --

25          MR. MITCHELL:  Exactly.

```
 1              THE COURT:  -- that could --
 2              MR. MITCHELL:  Agreed.  So --
 3              THE COURT:  No, I -- that -- in terms of that,
 4  review, like, how much of that remains to be done?
 5              MR. MITCHELL:  There -- there's still some review
 6  to do.
 7              And -- and I'll explain, your Honor, the -- when
 8  we initially prepared the privilege log, when we were under
 9  the, I guess, arrant assumption that the cutoff time we
10  were dealing with consistent with the New York Court's
11  February 18th cutoff, I believe we were current through --
12  we had obtained everything that was responsive and privileged
13  up until that point.
14              After the last hearing when your Honor stated
15  that the -- that wasn't the cutoff date that we were going
16  to use here and we needed to, you know, extend it toward --
17  all the way up to the subpoena compliance date, which is
18  in the subpoena states present and under the Middle District
19  case law for a Rule 45 subpoena, present means the date of
20  compliance since there's not an ongoing supplement due
21  under -- like Rule 26 would provide.
22              So for those, that's updated with regard to
23  the defendants, anybody acting on behalf of the Wayfarer
24  defendants, but that's sort of what came up at the last
25  hearing was there's a question that's still, I guess,
```

1    outstanding as to crew members.

2           Are the communications with crew members

3    responsive to the subpoena such that they need to be

4    culled, Bates numbered and logged as privileged or are

5    they not responsive to the subpoena?

6           Our position was that they weren't responsive

7    because these aren't employees acting on behalf of

8    Wayfarer.  They're just simply people that were crew

9    on the film, independent contractors for that time period.

10          I guess that -- and I know your Honor stated

11   at the last hearing at least definitively with regard to

12   if a message was sent out and there was no resummons or

13   no comment or something like that or an NDA, that those

14   didn't even need to -- that those could be excluded.

15          THE COURT:  That's right.

16          MR. MITCHELL:  So to answer the question, if

17   the crew members that responded with something substantive --

18   I think those were the words you used last time -- are

19   to be culled and Bates numbered and logged, we would simply

20   have to -- to do that.

21          We've already -- we've reviewed the -- the hits

22   that have come back and essentially a lot of this can be

23   eliminated.  I'll give you an example.  In the Gmail, you

24   see, like the term Blake, there's 556 hits.  Most of those

25   can be easily excluded when we review that data because

1   of the fact that a lot of these are a court listener,

2   fan emails or, for instance, on Mr. Signore's YouTube

3   page, he has automatic alerts.  So every time a video

4   comes out or a headline by some other creator or media

5   person comes out, those will come in.  So you can see

6   those and those are large chunks of the hits.  We can

7   exclude those.

8            THE COURT:  Okay.

9            MR. MITCHELL:  So really, it just comes down

10  to, you know, digging that down to -- you know, narrowing

11  down to who these crew members are that -- that -- if they

12  are responsive, that would fit in here.  And I think we

13  pretty well know the extent of how many of those there are.

14           The -- the -- I guess the difficulty or the

15  only remaining work that would be necessary would be to

16  actually -- and this is extensive.  I mean, it's -- it's

17  a substantial amount of work to go through and gather every

18  one of those communications, convert it to a document, a

19  PDA, Bates number it and log it.

20           So I'm not saying that there's 30 hours or 40

21  more hours of work to do, but it's not something that can

22  be done in two hours.

23           THE COURT:  Understood.

24           MR. MITCHELL:  And I think Mr. Signore, since

25  he's the one that is primarily running the searches, I'm

1    overseeing and I understand the process that's being --

2    that's being done and providing guidance there, but

3    given that these are his repositories and he's the one

4    that made the outreach communications and he knows who

5    we're dealing with, I think he could probably provide

6    more detailed of an answer, your Honor, if you -- if

7    you were so inclined to hear that.

8              THE COURT:  Okay.  Well, maybe in just a moment.

9    Thank you for that, Mr. Mitchell.

10             I -- I think in terms of responsiveness to the

11   request -- I might ask Ms. Governski -- but I think that

12   what I would probably -- if the parties haven't already

13   conferred about that issue, it sounds like there was a

14   conference about -- again, that be talked about last week

15   about these particular outreach emails where there was

16   no substantive response, but I -- I think to the extent

17   there's a question about whether other particular emails

18   are responsive, my first inclination would be to have

19   the parties confer about that.

20             But, Ms. Governski, we're all here today.

21   You've heard what Mr. Mitchell has said.  Is it your view

22   that those type of communications are responsive to the

23   subpoena?

24             MS. GOVERNSKI:  So I'm sorry.  It was -- it was

25   a little hard for me to follow that, but if the answer is

1  substantive responses from crew members, then, yes, those

2  would be responsive because especially if the content is

3  like reaching out on behalf of Justin or I talked to Justin

4  today.  I mean, those -- like, it seems like you have to

5  review them in order to determine whether they were sent

6  on their behalf or not and arguably, if Mr. Signore is

7  receiving information from other sources, that also is

8  relevant and responsive.  So I -- I would think that

9  those are responsive if they are substantive.

10       But I -- I just want to also, if I can just take

11  a quick moment to address the converting to PDFs, like, I

12  don't know that that is necessary.  I mean, we have a --

13  in the underlying case, we have an ESI stipulation that

14  I'm happy to provide about the format of this.

15       And oftentimes in production what is produced

16  are not PDFs, rather like Native format.  So we're welcome --

17  we're happy to, like, work with you on that as opposed

18  to having to convert them to PDFs.

19       But I was a little bit confused about the answer

20  about, like, whether in the 643 chat threads and the 9,684

21  lifetime emails, I have two questions.  First, have they

22  been -- have those been deduped or is it possible that if

23  it hits on Lively and it hits on Baldoni, it's a false

24  inflation of the total number because they're really the

25  same document?  So has that been deduped?

1          And then the second is I'm a little confused

2    by both Mr. Mitchell saying that this exists in raw

3    format and that all of these have been reviewed.  So have

4    all of the 64 chat threads and all of those emails been

5    reviewed or is that pending converting them to a readable

6    format, which by the way doesn't have to be PDF?  There's,

7    like, other formats that you can use to convert them in

8    a -- in a less time-consuming manner.

9          So those are my questions.

10         MR. MITCHELL:  I can answer those questions,

11   your Honor.

12         THE COURT:  I'm sorry?

13         MR. MITCHELL:  I can answer those questions if --

14         THE COURT:  Yes, please.  Go ahead.

15         MR. MITCHELL:  Okay.  Sure.  As far as the

16   converting to PDF issue, or Native format, to the extent

17   that some of these things exist in Native format or that

18   we have them in Native format, with the limited tools

19   that we have, given that we're not -- you know, what

20   eDiscovery vendors have, for instance, the HTML exports

21   for WhatsApp, that's a format that wouldn't necessarily

22   have to be converted into an PDF.  It's -- it's a format

23   that can be saved as a file and -- and sent.

24         Gmail, on the other hand, and some of these

25   others -- in fact, I would say at this point it's the

1  majority of the databases or repositories that we're

2  talking about here, we -- they're only in web form.

3  We don't have an exported version of that universe

4  of data.

5          So I -- I don't know how -- what Native

6  format a Gmail email could be provided in given that

7  we're looking at it in a search window and -- and we're

8  getting line item hits on -- on a -- in a web page.

9  We have to, you know, go through and print every one

10 of those things off a PDF to -- to make those work.

11         So, yes -- yes and no.  To some extent, some

12 of these things could be converted -- could be provided

13 in Native format without converting.  For a lot of the

14 others, I don't know any way to do that.  I think it

15 would have to be converted to PDF.  That's the one thing.

16         MS. GOVERNSKI:  Can I just quickly --

17         THE COURT:  Okay.

18         MS. GOVERNSKI:  -- address that one point just --

19         MR. MITCHELL:  Sure.

20         THE COURT:  Sure.

21         MS. GOVERNSKI:  We're more than hap- -- I'm more

22 than happy to confer with you on this and also have our

23 vendor talk about ways to remove any burden, like, including

24 maybe dragging it to a flash drive and sending it to them

25 to convert.  I think that there's ways around that.  Once

1  you've determined that these are responsive, I think we

2  can work together on that.

3          MR. MITCHELL:  Yeah.  I'm happy to talk to you

4  about it, yeah.  I just don't -- I don't know how to put

5  Gmail on a flash drive either.  So, yeah, I mean, if --

6  if you know a way to do that, then I'm all ears.

7          MS. GOVERNSKI:  No, our ven- -- I'm sure my

8  vendor does, yeah.

9          THE COURT:  Yeah.  That sounds like a good --

10 that sound like a good conversation for you all to have

11 after -- after our hearing today, that -- to make -- if --

12 if there's a way to facilitate that.

13          Mr. Mitchell, go ahead.  You were going onto the

14 next point.

15          MR. MITCHELL:  Okay.  Sure.  Thank you, your

16 Honor.

17          As far as whether there's an overlap -- in other

18 words, whether all of these hits are mutually exclusive of

19 the others, the answer to that is no.  For instance, the --

20 the -- for the Gmail, blink, we had 556 hits.  Lively, 512

21 hits.  A lot of those would overlap.  In other words, the

22 same email would give us a hit on both of those searches,

23 but every time we have to run one of those search terms,

24 we're going to get a list of emails and we're going to have

25 to look at all of those emails.  We don't know which ones

1    pinged in -- in response to another search.

2            In other words, we can't -- we can't eliminate

3    all of those emails and say, okay, don't send us those

4    hits back when we run the next search term.

5            Does that makes sense?

6            So it just -- you know, to some extent while

7    there is overlap and, you know, to the extent that we can

8    remember as we're reviewing those hits that, okay, you're

9    right, I know that whole group of stuff came back from

10   countless interviews, scroll past that, but still it

11   does require looking at it unfortunately.

12           And then for the last question, have all of

13   these hits been reviewed or are we still waiting for them

14   to be readable and in some readable format?  No, they're

15   all readable.  We can read all of them.

16           In fact -- oh, provide a little more color for

17   the Court on the extracted data for the -- for the sets

18   that we have where we do have HTML extracts, in Windows

19   File Explorer, using the Windows search just like you would

20   look on your computer and -- and see any other file up in

21   the top right corner there, you can run a search of a term,

22   what comes back in that file retrieve is you're going to

23   get a bunch of hits of HTML documents.

24           But when you click on each one of those, it

25   provides a preview just like Gmail does when you get your

1  responses back in a Gmail search, it shows a small

2  preview of -- of the surrounding text around the

3  highlighted -- the term, the hit.  So you're able to

4  ascertain much of the substance of -- of what that

5  communication is about.

6          And oftentimes, just, as I said, with the

7  courtless interview, even for -- for HTML, we wouldn't

8  have a subject -- email subject.  They're so -- all we

9  have is an HTML.  It would be HTML 1, HTML 2, HTML 3.

10  That wouldn't provide us any insight as to what's going

11  on or who it's from.

12          But in that preview for HTML files, it does

13  provide us that.  So in the same way that we're able to

14  eliminate large chunks of the Gmails as unresponsive,

15  we can do the similar thing using the preview in the File

16  Explorer.  So, yes, they've all been reviewed to determine

17  what's responsive.  This --

18          THE COURT:  Well, and I think --

19          MR. MITCHELL: -- is simply all of the hits that

20  came back.  That's all.

21          THE COURT:  Yeah.  No, and it's helpful.  I --

22  I appreciate you filing it.  I guess one -- one area where

23  you might be able to cut down on some of this and -- and I

24  don't -- I don't want to invite Mr. Signore to speak unless

25  counsel wants him to, but -- and I certainly don't want you

1   to reveal anything either, but to a certain extent,

2   the -- I don't know how many people were communicated

3   with, but to a certain extent understanding who was

4   contacted or who was providing information might cut

5   down somewhat on the review because, like you said, there

6   are going to be emails that Mr. Signore was receiving

7   that have nothing to do -- I mean, they have nothing to

8   do with what Ms. Governski and her client are seeking

9   such as reports from other media outlets or other court

10  databases or what have you.

11          MR. MITCHELL:  Sure.

12          THE COURT:  So that -- that may -- that may help.

13          MR. MITCHELL:  Your Honor, I --

14          THE COURT:  Go ahead, Mr. Mitchell.

15          MR. MITCHELL:  I forgot to mention one thing

16  or respond to one thing that Ms. Governski said, the

17  first thing she mentioned when we were talking about

18  whether some of these crew member communications are

19  responsive, something that she -- she mentioned, I think

20  that actually helps a lot where she proposed a hypothetical

21  where a crew member stated I'm contacting you on behalf

22  of Justin Baldoni, if we're using that as a modifier to

23  identify a responsive -- what's responsive and what's not,

24  that, I would say, certainly does fall within the -- the

25  parameters of the subpoena because it's asking -- it's

1   essentially someone communicating on behalf -- stating

2   he's communicating on behalf of a Wayfarer party.

3           If we're only including those crew members

4   that are stating that they're communicating on behalf

5   of a Wayfarer party, rather than every crew member that

6   Mr. Signore talked to, even if he was only talking to

7   them about the temperature on the set, you know, while

8   he was, you know, hanging lights or something like that,

9   that would definitely narrow down the -- the remaining

10  work to do.  So I mean --

11          THE COURT:  Well --

12          MR. MITCHELL: -- if there's anyway we can, you

13  know, come up with a -- come up with a definition that

14  could help us differentiate between those.

15          THE COURT:  Ms. Governski, I think Mr. Mitchell

16  has a point.  I mean, the -- the theory of -- of relevance

17  here is that there's a claim that these defendants were

18  engaged in an organized campaign to defame or, you know,

19  otherwise turn the, you know, the media or public sentiment

20  against her based on her claims of sexual harassment.

21          And so is it not fair to say that in this search,

22  we should have some involvement of the defendants or somebody

23  acting on behalf of the defendants, as you said, rather than

24  just Mr. Signore searching for every comment he received

25  from people that maybe he had -- where he initiated the

1   outreach and it didn't have anything to do with, you know,

2   the defendants?

3           MS. GOVERNSKI:  I actually think that the way

4   that you just framed it, your Honor, is -- is the right

5   way.  I mean, we could do that if it is not in response

6   to Mr. Signore's solicitation, but it is a crew member

7   contacting him on their own.  I would say that is a line

8   to draw.

9           I think it's going to be pretty hard for me to

10  agree that the email has to expressly say, like, on behalf

11  of Justin because I don't -- you know, there -- we're --

12  we're in the midst of summary judgment briefing and going

13  through the evidence to determine who was acting on their

14  behalf, right?  And so it's a little hard to say, sure,

15  just exclude anyone who you don't know was acting on their

16  behalf or who is mentioned in the email as acting on their

17  behalf as opposed to, like, hmmm, this crew member just

18  emailed me out of the blue giving me dirt on Blake Lively.

19          I would say that email would be responsive,

20  but if it's in response to something Mr. Signore reached

21  out to relating to his documentary, for instance, I would

22  feel comfortable drawing the line there.  But I think it's

23  hard to draw the line, like, for other things -- in another

24  way.

25          THE COURT:  Okay.  So does that --

```
 1              MR. GORDON:  (Inaudible interruption.)

 2              THE COURT:  -- does that make sense, Mr. Mitchell

 3    and Mr. Gordon?  I think --

 4              MR. GORDON:  No, no, no --

 5              THE COURT:  -- what Ms. Governski has said --

 6              MR. GORDON: -- (inaudible interruption.)

 7    Respectfully, no, it doesn't, your Honor.  These -- it

 8    expands the scope of the subpoena.  The spoken specifically

 9    references Wayfarer defendants or their counsel or agents

10    acting on their behalves.

11              THE COURT:  Well --

12              MR. GORDON:  Again, my --

13              THE COURT:  Okay.  Well let's -- let's go --

14    let's get a little more specific then if we're looking

15    at the actual requests.

16              So Request No. 1 is for documents and communications

17    provided to you by any of the Wayfarer defendants or their

18    counsel.  Okay.  So we've got that.

19              Any agreements -- any agreements you have --

20              MR. GORDON:  There are no agreements with --

21              THE COURT:  Okay.  All right.  I understand.

22              MR. GORDON:  -- with Production No. 2.

23              THE COURT:  Let me --

24              MR. GORDON:  Go ahead.

25              THE COURT:  Yeah, let me just...
```

1          So Request No. 5 does appear to be a little

2    broader than the earlier ones in that it is seeking

3    documents and communications concerning a bunch of

4    things related to the case and -- and Ms. Lively and

5    others.

6          MR. GORDON:  I -- I would -- I -- I would --

7          THE COURT:  Hold on one second.

8          MR. GORDON:  Yes, your Honor.

9          THE COURT:  And that were made in connection

10   with or on behalf of the Wayfarer defendants or their

11   counsel.  This request includes circumstances in which

12   any Wayfarer defendant or their counsel or anyone acting

13   on their behalf provided you with a statement, a script,

14   talking points or any information.

15         So I think that -- does that get to what you're

16   talking about, Ms. Governski?

17         MS. GOVERNSKI:  That, and No. 4, your Honor.

18         I mean, No. 4 says all documents and communications

19   regarding your digital online content to creator or influencer

20   services or strategies concerning the consolidated action in

21   connection with or on behalf of.

22         So, you know, any documents or communications

23   about, hey, publish this about Ms. Lively today would be,

24   I think, responsive to 4 and 5.  In other words, we were

25   not intending by our request for Mr. Signore to be making

1  a legal determination about who was an agent or acting

2  on the behalf of the Wayfarer defendants.  That would --

3  you know, we were seeking communications -- incoming

4  communications that he received pitching stories about

5  Ms. Lively.

6         And so -- so that's really what we're -- what

7  we're getting at here.  And so for us to try to draw a

8  distinction and have Mr. Gordon or Mr. Mitchell or

9  Mr. Signore decide, well, this one was on their behalf,

10 but this one wasn't doesn't really feel like something

11 they're even in a position to determine at this point.

12         THE COURT:  Well, I just want to back up a

13 little bit --

14         MR. GORDON:  I think --

15         THE COURT:  -- because, Mr. -- Mr. Gordon, I

16 do think -- I want to go back to what we were talking

17 about just a moment ago.  I do think that what -- between

18 Mr. Mitchell and myself and Ms. Governski talking about

19 eliminating the category of communications in which

20 Mr. Signore is reaching -- affirmatively reaching out

21 to people and getting responses back, that -- that seems

22 to be -- to me to be the -- a giant category of

23 information --

24         MR. GORDON:  It's huge.

25         THE COURT:  -- that we can -- that if -- if --

1   if we're in agreement on eliminating that, I think that --

2            MR. GORDON:  Right.

3            THE COURT:  -- does save quite a bit -- quite

4   a bit of time here.

5            But I think what Ms. Governski is saying if

6   you -- and I think it seems to fit and I'll let you,

7   Mr. -- I'll let you jump in here in just a minute.

8            MR. GORDON:  Sorry.

9            THE COURT:  Just give me a --

10           MR. GORDON:  Sorry.

11           THE COURT:  Let me finish the thought.

12           If -- if Ms. Governski is saying let's put --

13  let's just search -- instead let's look for the things

14  that were coming in, you know, un- -- I guess unprompted

15  by Mr. Signore that were feeding information and let's

16  not have you deciding whether they were acting on behalf

17  of the defendants or their counsel, because you may not

18  know that, but if it's coming in and it fits this request,

19  then I think that -- I think that -- hopefully, that

20  could be a much smaller universe of --

21           MR. GORDON:  Right.

22           THE COURT:  -- of information to look through

23  and --

24           MR. GORDON:  Right.

25           THE COURT:  -- a much easier list.

1          But, Mr. Mitchell, go ahead.

2          MR. MITCHELL:  I --  I mean, I think that

3    actually makes sense and it -- you know, it kind of --

4    this actually kind of reminds me of, you know, how do

5    we draw a distinction like this?  What is it -- how do

6    we define this?

7          It reminds me of -- was it Justice Scalia (sic)

8    said I don't know the definition of pornography, but I

9    know it when I see it, right?  You know, how do we define

10   what's on behalf of?

11         If we can eliminate the communications where

12   Mr. Signore made the outreach to the crew member, that

13   would, I believe, make things a lot easier such that

14   we're limiting this to communications where a crew member

15   reached out to Mr. Signore unprompted.  And I think

16   that -- I would say that's a fair compromise under the

17   circumstances.

18         THE COURT:  And you -- just to be clear, you

19   think that you have covered in your search and review

20   everything that would have come directly from the defendants

21   and their counsel, is that right?

22         MR. MITCHELL:  Yes.

23         THE COURT:  Okay.

24         MR. MITCHELL:  That's correct.

25         THE COURT:  All right.  Okay.  Mr. Gordon,

1   I think Mr. Mitchell wrapped it up there, but did you

2   want to add anything else?

3           MR. GORDON:  Other than to vent, I probably

4   shouldn't, Judge, because --

5           THE COURT:  Okay.  I was going to say --

6           MR. GORDON:  I -- I -- I -- I keep going back

7   to Rule 45 in terms of trying to avoid the undue burden

8   and -- and I -- I appreciate the compromise.  I just

9   still think it's super expansive and it's just incredibly

10  burdensome to Mr. Signore and to my office.  That's the

11  concern.

12          THE COURT:  Well, yeah.  Well, I -- I understand

13  that, sir, but I guess I'll go back to the -- sort of the

14  original hearing we had a few weeks ago where, you know,

15  I invited -- I invited you to tell me what -- whether there

16  was issues with the scope -- if there were issues with the

17  scope of these requests and that's certainly something

18  that -- apologies -- that's something that --

19          MR. GORDON:  Well, now, that -- that --

20          THE COURT:  -- that --

21          MR. GORDON:  That's on me and I must have

22  interpreted the manner in which I read these subpoenas --

23          THE COURT:  Well, but I think that --

24          MR. GORDON:  -- when I read these subpoena

25  requests.

```
 1          THE COURT:  Ultimately -- ultimately, Mr. Gordon,
 2  we are getting -- even though at that hearing a few weeks
 3  ago there was no issue raised with the scope of the request,
 4  the thing Ms. Governski is offering narrowing compromises
 5  here that I think are helpful.
 6          So -- so I think we're getting around to that
 7  and I understand, look, I'm -- Mr. Signore is not a party
 8  to this case and, you know, so the -- the burden analysis
 9  is -- is different for him.
10          Although I will say -- and I know that your
11  motion did raise an issue of burden with respect to the
12  privilege -- producing of privileged materials because
13  the -- Mr. Signore believes that Ms. Lively should be
14  getting these from the defendants.  So that's something
15  that I am -- I am looking at.
16          But in terms of the scope of the request, I
17  think we've already -- we've already -- that ship has
18  sailed, but yet we are still discussing compromises.  So
19  I think, you know -- I think -- I think what's been proposed
20  by Ms. Governski and reiterated by Mr. Mitchell makes
21  sense that we should lay our focus there on the remaining
22  search and review.
23          MR. MITCHELL:  Can I add, your Honor, that I'm
24  sorry.  Go ahead.  I'm sorry.
25          THE COURT:  No, no.  Go ahead.
```

 1            MR. MITCHELL:  Regarding, you know, the -- the

 2    burden analysis, I know that's not before the Court right

 3    now, it's probably best suited to raise this, you know,

 4    at a subsequent hearing when the time is right after the

 5    work is complete here, but, you know, the -- as far as

 6    Rule 45 burden authority is concerned, there -- there's

 7    no necessary element of malice that's required to find

 8    undue burden with regard to a Rule 45 subpoena, you know,

 9    for purposes of compensating costs and whatnot.

10            And I know that again it's not before the Court

11    right now, but, you know, still even if -- if -- with

12    compromises and responding, you know, to subpoena requests

13    that aren't necessarily overly broad or expansive, burden

14    can still become, you know, an issue that -- that requires

15    a Court's attention at -- you know, as far as again for

16    compensating time and expenses and whatnot.  So we'll bring

17    that up at a later time.

18            THE COURT:  Okay.  Yes, Ms. Governski?

19            MS. GOVERNSKI:  Well, I -- well, I mean, I would

20    think the time -- the time has passed to bring up shifting

21    of fees.  So we would object to that.

22            And also we tried to confer on this before you

23    filed a motion to quash.  We tried to try to resolve this.

24    I think a lot of where we are now and how inefficient it

25    has been is that you rushed to file a motion to quash and

1  then didn't do the proper collection and search.

2          So, I mean, I -- I -- I am sympathetic, of

3  course, to Mr. Signore being a third party, but I also

4  think a lot of this inefficiency was caused by kind of

5  consistently not just doing it the right way the first

6  time.

7          I also would note looking even at this hit

8  report, they repeatedly said how narrow the terms were.

9  If you look at the terms, they're all very narrow.  There

10 is no suggestion that the terms were hitting on false

11 hits.  Even the ones that Mr. Mitchell was saying are not

12 responsive were because they were other articles that were

13 about our client.

14         MR. MITCHELL:  That was just an example.

15         MS. GOVERNSKI:  Okay.  Well, I don't think 643

16 chat threads feels particularly onerous to produce and it's

17 hard for me to understand if they're individual chats or

18 full threads.  It's hard to know, but with the number of

19 hits, it seems -- I actually don't know the answer to that.

20         And then 10,000 emails that likely are multiple

21 ones of the same version, again it just doesn't feel to me

22 like that is a really huge undue burden.  The burden comes

23 from their inability to dedupe or their -- you know, I think

24 that there's probably ways to make it more efficient.

25         THE COURT:  Well, I --

 1              MR. MITCHELL:  (Inaudible response.)

 2              THE COURT:  -- you know, I -- I -- I guess,

 3    let's -- and let's -- I definitely agree that there could

 4    have been a lot more time spent by counsel on this before

 5    we got into this process, but we are working through it

 6    now and so -- and I think we're going to get -- we're going

 7    to end up in the right place with this, but if there -- in

 8    terms of the -- in terms of the burden, I will -- I will

 9    just say that, yes, it does not seem like a tremendous

10    amount of information, but the complicating factor here

11    is that Mr. Signore has raised in his motion to quash a

12    claim that all of this information is privileged and the --

13    the reason why this is becoming so cumbersome is because

14    in order to make a claim of privilege, you have to do it

15    specifically and it has to be document-by-document.

16              And that's why we go through this.  It's

17    because there's -- there's so much in here that could be

18    responsive and not privileged.  But because we are now

19    requiring -- because there's a claim of -- of -- of

20    privilege as to all of this information, that is why --

21    you know, and it's -- it's Mr. Signore's right to assert

22    the privilege, but he has to substantiate it and that's

23    why we're kind of in this struggle that we're in right

24    now.

25              So -- but we're going to push through.  So

1   here's --  here's what -- here's what I'm going to do.

2   Again, Mr. Mitchell and Mr. Gordon, we need to have the

3   attachments to that text message chain pulled and sent

4   to that -- as part of the in camera review.  If you could,

5   do that electronically or in -- or in hardcopy, but I'll

6   just enter an endorsed order on that.

7           MR. GORDON:  Yes, your Honor.

8           MR. MITCHELL:  Your Honor --

9           THE COURT:  Yes.

10          MR. MITCHELL:  -- one thing on that.

11          THE COURT:  Yes.

12          MR. MITCHELL:  I don't want to speak out of

13  turn on the availability.  I -- I know what you're referring

14  to.

15          THE COURT:  Yes.

16          MR. MITCHELL:  And -- and I -- I assumed that

17  what you're seeing there is a function of the software

18  tool used to extract that text message thread that doesn't --

19  but let me just add with the caveat that I don't know that

20  in the Native format and the actual SMS format on the phone,

21  the device itself, that those attachments are even available.

22  To the extent they are available, absolutely.

23          THE COURT:  Okay.

24          MR. MITCHELL:  I just wanted to add the note

25  that it's -- it is a possibility that some of those things

1    are showing up that way because they aren't actually on

2    the device anymore.

3           THE COURT:  Okay.  Understood, understood.

4    Thank you.

5           Okay.  And then -- let's see here.  So we're

6    going to do that.  Mr. Signore still has -- there's still

7    time on the extension to produce the final privilege log.

8           Oh, I was going to ask Ms. Governski because

9    we've -- it's been a while since we -- we spoke on this

10   topic and -- but have -- in terms of the analysis of

11   overcoming the privilege, I just want to revisit and ask

12   if there -- there are communications that the defendants

13   have produced with Popcorned Planet or Mr. Signore?

14          Have you been able to obtain any of those

15   through your discovery?  I understand you file a motion

16   to compel and a spoliation motion.  I just wanted to see --

17   the Southern District New York docket is very big.

18          MS. GOVERNSKI:  And I understand.

19          THE COURT:  You know it better than I do.

20          MS. GOVERNSKI:  Yes, yes, your Honor.

21          We have received some, including, as I think

22   I mentioned at the original hearing, one communication

23   with a defendant in December of 2024 and then text chains

24   with Ms. Nathan.

25          So I think that some of the items on the

1    privilege log between Mr. Signore and Ms. Nathan, we have

2    received.

3              THE COURT:  Okay.

4              MS. GOVERNSKI:  But only up to February, right?

5    I mean, we haven't received prior later ones.

6              THE COURT:  Okay.

7              MS. GOVERNSKI:  So we haven't -- and it seems

8    like what Mr. Signore is -- has -- how he has described on

9    his privilege log and I think here, which are texts with

10   Melissa Nathan, those -- he certainly seems to have more.

11             So, you know, part of this also is we have

12   filed a motion for spoliation, including relating to

13   Signal communications, but also a lot of the ways we've

14   been able to figure out that the defendants have not been

15   fully transparent with us is by receiving third-party

16   discovery where the chains are different or the -- or not

17   different but, like, certain materials redacted in their

18   chain and not in the produced chain and we find out these

19   materials actually shouldn't have been redacted.

20             So there is a separate relevance with respect

21   to getting the communications from both sides as opposed

22   to just from Ms. Nathan and it does seem like Mr. Signore

23   has more communications than what we have received from

24   Ms. Nathan.

25             I would also suggest that while I understand

1    Mr. Signore's point about privilege and I very much value

2    a reporter's privilege being a former reporter, I -- I

3    think we -- it's not a secret that Ms. Nathan is a source.

4    I mean, his privilege log admits that Ms. Nathan is a

5    source and she's produced documents with him.

6          So it just feels to me like one way to potentially

7    cut through this is go ahead and produce the communications

8    with Ms. Nathan, which are responsive and, you know, let the

9    parties confer and see whether that's sufficient.

10          So I -- I just think that there are ways that the

11   parties could maybe try to seek to resolve this outside of

12   the privilege, but again it felt like there was an immediate

13   rush to try to protect absolutely everything as opposed to

14   seeing if we could find some middle ground.

15          THE COURT:  Well, I would invite the parties to

16   have that conversation as well as to have the conversation

17   that you mentioned earlier about any sort of strategies you

18   have, Ms. Governski, that you could offer Mr. Mitchell and --

19   and Mr. Gordon and their team for facilitating sort of the

20   extraction or -- of these -- of these documents without

21   having to convert them to PDF.

22          But I would also invite the parties to consider

23   whether that is something that you can do to resolve this

24   matter.

25          MR. GORDON:  And I apologize, Judge.  I just

1  need some clarification.

2          THE COURT:  Yes.

3          MR. GORDON:  Because -- and I mean this

4  respectfully, but it sounds almost like you're asking

5  us to discuss waiving the journalistic privilege.

6          THE COURT:  Well, I don't know what Ms. Governski

7  has in mind.  I'm -- I'm not suggesting that you should or

8  have to do that, but she's suggesting there may be a

9  compromise to be -- to be had here and I just suggest

10 that you have a conversation outside of this hearing about

11 whether that's possible.

12         MR. GORDON:  Yes, your Honor.

13         THE COURT:  I'm -- I'm not suggesting that

14 Mr. Signore should waive any privilege that he has, but,

15 you know, to the extent that he wishes to do that because

16 something has already been produced by a defendant in

17 the case, that -- that may -- that's something you can

18 counsel him on.

19         All I'm saying is it would, you know, certainly

20 be a good -- a good thing to have those discussions and see

21 where you can get with it and have the discussion about what

22 methods might be available to expedite or facilitate what

23 you're doing and -- so -- so I would just encourage the

24 parties to do that.

25         And again, to the extent that you can get the

1  attachments to the text message chain that's in the

2  privilege log, Item No. 4, I'll direct you to do that.

3         And then I'll also, based on our conversation

4  today, my understanding is there is an agreement that

5  we're going to just focus the search on communications

6  that affirmatively came in from crew members that, you

7  know, were not in response to an outreach from Mr. Signore.

8         Mr. Mitchell, yes?

9         MR. MITCHELL:  I was going to -- I'm glad you

10  mentioned that.  I wanted to ask you when we do file the

11  final privilege log next week --

12         THE COURT:  Yes.

13         MR. MITCHELL: -- that would encompass any of

14  these additional -- within the parameters of what the

15  Court has just ruled, are we providing an updated in camera

16  binder with those materials or are we waiting until we

17  discuss it further?

18         THE COURT:  Why don't you -- you -- why don't

19  you hold off on that.

20         MR. MITCHELL:  Okay.

21         THE COURT:  I will take a look at those.  I'll

22  take a look at what's filed next week and then, you know,

23  in the meantime, counsel should have a conversation about

24  some of the things we've discussed today.

25         And then I think once I have a chance to look at

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

1  that and look at this a little further, I'll probably

2  set another status.  I know we're kind of going into

3  the holiday.  So if -- it may be that the next time

4  we -- we can meet will be after that, but we'll -- I'll --

5  I'll confer with you all before I set anything.

6          MR. GORDON:  Very good.

7          THE COURT:  Okay.

8          MR. MITCHELL:  Thank you, your Honor.

9          THE COURT:  All right.

10          MS. GOVERNSKI:  Thank you so much, your Honor.

11          THE COURT:  I think that -- yeah absolutely.

12  I think that covers everything for today.

13          Thank you all for being present and for your

14  contributions and we will be adjourned.

15          MR. GORDON:  Thank you, your Honor.

16              (Whereupon, the Court adjourned

17               at 3:44 p.m.)

18                    --oo0oo--

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

1  UNITED STATES DISTRICT COURT   )

2                                 )

3  MIDDLE DISTRICT OF FLORIDA     )

4

5                 REPORTER TRANSCRIPT CERTIFICATE

6

7          I, LORI ANN CECIL VOLLMER, Official Court Reporter

8  for the United States District Court, Middle District of

9  Florida, certify pursuant to Section 753, Title 28, United

10 States Code, that the foregoing transcript is a true and

11 correct transcription of the stenographic notes taken by the

12 undersigned in the above-entitled matter, Pages 1 through 40,

13 and that the transcript page format is in conformance with

14 the regulations of the Judicial Conference of the United States

15 of America.  I further certify that I am not attorney for, nor

16 employed by, nor related to any of the parties or attorneys to

17 this action, nor financially interested in this action.

18         IN WITNESS WHEREOF, I have set my hand at Tampa,

19 Florida, this 18th day of January 2026.

20

21              /s/ Lori Ann Cecil Vollmer

22              Lori Ann Cecil Vollmer, CSR, RPR
                United States Court Reporter

23

24

25

                      UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
                            TAMPA DIVISION